**James F. MULLINS**

v.

**PFIZER, INC.**

**No. 2:90CV917 (JBA).**

United States District Court,
D. Connecticut.

May 25, 2001.

Joseph E. Moukawsher, Thomas G. Moukawsher, Moukawsher & Walsh, Groton, CT, for Plaintiff.

Jonathan B. Orleans, S. Dave Vatti, Zeldes, Needle & Cooper, Bridgeport, CT, for Defendant.

### OPINION

ARTERTON, District Judge.

This ERISA case presents the familiar scenario of a large company seeking to reduce the size of its workforce by offering enhanced early retirement packages to particular employee groups. Plaintiff James Mullins missed one such package by taking early retirement six weeks before an enhancement was announced. He has sued his former employer claiming that Pfizer breached its fiduciary duties by failing to disclose to him the fact that the package was under consideration when he was trying to decide whether and when to retire. Summary judgment was initially granted on Mullins' ERISA claims, but the Second Circuit reversed, *see Mullins v. Pfizer*, 23 F.3d 663 (2d Cir.1994), and the case was remanded to this Court for trial.

After a four day trial, a jury returned a verdict in Mullins' favor and judgment entered accordingly, but the judgment was later vacated after the Second Circuit decision in *Sullivan v. LTV*, 82 F.3d 1251 (2d Cir.1996), that "there is no right to a jury trial in a suit to recover ERISA benefits...." The parties agreed that the case would instead be tried to the Court, based upon the evidence presented at the Sep-tember 1995 trial and further post-trial briefing reflective of subsequent, evolving legal authority bearing on issues presented by the trial evidence. This ruling follows.

## I. Findings of Fact

### A. Stipulated Background Facts

James Mullins commenced employment with Pfizer Inc. on October 13, 1955, and worked for Pfizer for 34½ years until he retired on April 1, 1990. Mullins was a participant in Pfizer's Retirement Annuity Plan and its medical and dental plans, all of which are qualified plans under ERISA. Pfizer's Retirement Plan contained provisions permitting employees younger than 65 years of age to retire early with either a full or reduced pension depending on the employee's age and years of service. Mullins elected early retirement pursuant to the Retirement Plan effective April 1, 1990. He was then 57½ years of age and was eligible for a retirement benefit discounted by approximately 10 percent from his normal retirement benefit. Pursuant to the terms of the plan, Mullins elected a lump sum distribution of his retirement benefit. Stips. of Fact, Tr. at ¶. 47–50.

On May 16, 1990, Pfizer announced the offering of a Voluntary Separation Option (the "VSO") to certain employees at its manufacturing facility in Groton, Connecticut. Eligibility for the VSO was restricted to regular overtime eligible employees and foremen in the Suciac, BioRecovery and Antibiotic Departments, who were employed on the date of the announcement. The terms of the VSO included (a) a lump sum severance payment of two weeks of pay for every year of employment up to a maximum of 52 weeks pay; (b) full payment of 1990 vacation entitlement in a lump sum upon separation; (c) a long service bonus according to existing Pfizer policy calculated up to the separation date

and paid upon separation; (d) retirement benefits for retirement eligible employees, vested employees not yet retirement-eligible to receive their pensions when they became eligible under the terms of the retirement plan, and employees not yet vested in the Retirement Plan to be immediately vested and paid a discounted lump sum benefit upon separation; (e) continuation of medical, dental and basic life insurance benefits for employees not retirement eligible until the employee found another position and became eligible for coverage under another plan or for 12 months from the date of separation, whichever occurred first; (f) payment for educational assistance available for 24 months to a maximum of $4,000 for education or training to enhance employability; (g) assistance in seeking new employment outside Pfizer; and (h) availability of Pfizer employee assistance plan services. If more than 100 employees accepted the offer, Pfizer would select employees for inclusion in the VSO plan based on length of service, with priority given to the employees in the Suciac Department. The window for eligible employees to accept the offer was from June 11 through June 18, 1990. Stips. of Fact, Tr. at ¶. 47–50.

■ As the sponsor and administrator of the VSO plan, Pfizer was a fiduciary within the meaning of 29 U.S.C. §§ 1002(21)(a) and 1104. The VSO was a new ERISA plan, not an amendment to the existing Retirement Plan, and prior to the announcement and implementation of the VSO, Pfizer did not have a similar plan available for Groton employees. If Mullins had been employed by Pfizer on May 16, 1990, he would have been eligible for and would have elected to participate in the VSO. Had he done so, he would have received $35,000 in severance pay and would have been eligible for a $4,000 education assistance payment. Stip. of Fact, Tr. at

¶. 47–50. Pfizer never disclosed to Mullins as of his April 1, 1990 retirement, however, that an early retirement incentive plan was under consideration by the company. *Id.*

B. *Economic Conditions at Pfizer and Development of the VSO*

Pfizer is a large multinational corporation with approximately 100 different facilities in numerous countries throughout the world, of which the facility in Groton, Connecticut, was one. Pfizer had a number of divisions, and as of 1989 the Groton facility manufactured for the Specialty Chemicals Group, the Animal Health Group, the Food Science Group and the International Pharmaceuticals Group. The Groton facility was one of Pfizer's original manufacturing facilities, and in the 1950's it had expanded its operations and grown rapidly, but saw a significant slowing in the 1980's. Groton was a large scale bulk manufacturing operation that focused on production through fermentation and bioprocessing, but there was significant debate amongst plant management and management of the Special Chemicals division at the corporate level regarding the continued viability of such operations in Connecticut. Tr. at 424–25. Business conditions at the Groton facility in the mid to late 80's were difficult, because the plant was overstaffed and "not competitive in the marketplace." Tr. at 538. Plant management therefore began to examine ways to make production methods more efficient and profitable. Tr. at 539.

In particular, the Suciac operation at Groton, a labor-intensive process that used a technology called pan fermentation to produce citric acid, was considered "uneconomic and outdated," and Groton was thought to be one of the last facilities in the world to use the technology. Ex. 18. The elimination of the Suciac operation

would also cause streamlining of the Biorecovery operation at Groton, the unit in which Mullins was employed. Exs. 9, 18. These changes would produce what Pfizer euphemistically termed "excess personnel," but the concept of layoffs was antithetical to the Pfizer tradition at the time, and "keep[ing] everybody employed and on their jobs" was a Pfizer objective. Tr. at 539. Although layoffs remained an option, no one in management at the Groton facility was eager to implement them. *Id.*

A retirement incentive package had been offered in November of 1987 to 25 employees at Pfizer's Southport, North Carolina plant who were being displaced by automation. Ex. 30; Tr. at 495–96. The terms of that Voluntary Separation Incentive Program mirrored those eventually offered to Groton employees, save an additional lump sum of $5,000 paid to each accepting employee. *Id.*

Joseph Schachner was plant manager for Groton, and was "operationally responsible" for the facility, which included manufacturing operations, hiring and recruitment of new personnel, and general maintenance. Tr. at 423. Barton Finegan was the director of employee and community relations at the Groton facility at the time in question, and in late November or early December 1989, Schachner asked Finegan to do a demographic analysis of the current work force and the staffing requirements for Groton, and to investigate the possibility of a "separation package" as a possible solution for the reduction in force that apparently was going to be necessary at Groton. Schachner Test. at 448; Finegan Test. at 547–548. On December 30, 1989, in response to this request, Mr. Finegan produced a report entitled "Groton Manning and Retirement Projections," which concluded that the Groton plan was going to be overstaffed, and suggested that Pfizer implement a

"separation incentive program to encourage people to voluntarily leave." Tr. at 550, 261–262, Pl.Ex. 4. The primary component of the separation incentive program proposed by Mr. Finegan was one week's pay per year of service offered to all employees, but also included six months health insurance coverage, educational and outplacement assistance. Tr. at 550, Pl.Ex. 4. At trial, Mr. Finegan testified that the only alternative to the proposal, in his view, was to layoff employees, which Pfizer "had never really done and didn't want to do," *id.*, but he was also not sure that the program would be accepted and implemented. Tr. at 551. Finegan projected the costs of such a program at Pfizer to be approximately $ 3.2 million, and discussed the idea extensively with Schachner and Kerry Hertenstein, Assistant Plan Manager. Schachner, Hertenstein, and Finegan needed the support of division management in New York, however, for they could not implement the VSO plan. Tr. at 552.

Schachner reported to Niall Conway, vice president of manufacturing for the Specialty Chemicals Group, Tr. at 426, who in turn reported to Don Kolowsky, the president of Specialty Chemicals Group. Tr. at 891. Both Conway and Kolowsky worked out of corporate headquarters in New York City. Neither Conway nor Kolowsky could give final approval for a VSO at the Groton facility, as such approval had to come from the corporate management committee, referred to as the "CPC." The CPC was composed of heads of the various Pfizer operating divisions, the chairman and the president of the company, and other "advisory members." Tr. at 427. In a memorandum dated January 14, 1990, Finegan's idea for a VSO was forwarded to Mr. Conway, along with the cost projections he had completed. Tr. at 452, Ex. 5. Hertenstein, the author of this memorandum, characterized it not as a recommen-

dation by Groton management, but as a description of a proposal they were studying. Tr. at 736.

At the request of Charles Schneider, the General Production Manager of the Specialty Chemicals Group, on February 9, 1990 Hertenstein also drafted a memorandum addressing the impact of the Suciac shutdown at the Groton facility, which would result in net excess personnel of 87. Tr. at 737, Ex. 7. The first sentence of the memorandum outlined its purpose, stating that "[i]n the attached study, the Groton Plant's excess personnel situation is examined and a course of action is recommended to effect an appropriate reduction in force." Ex. 7. In this memorandum, Hertenstein listed the options for addressing excess personnel, including layoffs, a one week pay per year of service incentive program for Suciac and Biorecovery employees only, a one week pay per year of service incentive program for the entire plant, and a two weeks pay per year of service incentive program for Suciac and BioRecovery employees only. Ex. 7. Layoffs, characterized as the "least expensive option," were not recommended because they were "contrary to the Pfizer tradition and would adversely affect the Corporation's public image," and the next two options were discounted for various efficiency reasons. The two weeks pay per year of service incentive program for Suciac and Biorecovery employees was recommended as the option that "would best serve the Plant" because the needed reductions could occur without having to reshuffle the remaining employees, and a targeted reduction would minimize "ill will from already retired people from other parts of the Plant." *Id.* The cost of this program was estimated to be $ 1.7 million, and the memorandum did not propose other aspects of the VSO, including continued health insurance benefits and education assistance. Tr. at 737, 306–307, Ex. 7.

Finegan continued to work on the VSO proposal, under the supervision of Schachner, Tr. at 452, and Hertenstein testified that Finegan "bore the brunt" of taking the proposal through the various levels of the corporate hierarchy in order to win ultimate approval. Tr. at 744. At trial, Finegan literally sketched out the multiple players in the Special Chemicals division who were involved in consideration of the VSO proposal, including Pfizer's president Dr. Laubach; Conway's boss Mr. Kolowsky, the head of the Specialty Chemicals division; several Pfizer executive vice presidents in charge of finance and personnel issues; members of Pfizer's in-house legal team; and staff members from various "corporate functions" within Pfizer, including corporate communications and corporate employee relations. Tr. at 558–564. According to Finegan, these various arms of the Pfizer corporation all had input into the development of the Groton VSO. He, Schachner and Hertenstein would work on a version, and Schachner and Hertenstein would forward it to Conway for comment, while he would communicate with the corporate personnel people, including Tom Newton and Jim Donahoe. Tr. at 564, 570. According to Finegan, the issues raised by other people involved in the process included whether to include junior employees, the "nuances" about the provision of continued insurance benefits, and the expense of the program. Tr. at 580. Mr. Finegan, however, did not identify any Pfizer individuals, at the plant management or corporate level, who disagreed with the rationale for the VSO, or the basic idea of offering one to Suciac and Biorecovery employees.

On March 22, 1990, Hertenstein drafted a document entitled "Voluntary Separation Program—Discussion of Pros and Cons," which included a statement that "[t]here is a clear business need for an incentive pro-

gram," and that a narrow and targeted incentive plan would increase the number of non-retirement age employees leaving the plant while avoiding the loss of large number of skilled employees. Ex. 13. On the "Con" side, the document notes that "employees who have already retired from the affected departments will be unhappy that they were excluded from the incentive," and that Pfizer *"may* wish to pay these people as if they were part of the incentive in order to avoid these hard feelings." *Id.* (emphasis in original). As the manner in which the proposed VSO was to be communicated to employees was considered an integral part of the plan, a draft letter to the Groton employees explaining the VSO offer also was prepared on March 22, 1990. Tr. at 574, Exs. 14, 15. This letter described the business need to eliminate the Suciac operation and streamline the Biorecovery unit, and emphasized that there would be "NO layoffs;" rather, the company would handle the reductions in the Suciac and Biorecovery units "in the best Pfizer Family tradition." Ex. 14 (emphasis in original). It then went on to describe the VSO program, and included all the main components comprising the incentive plan first envisioned by Finegan, although in some cases the amounts increased: two weeks of severance pay per year of service, 12 months of continued insurance benefits, educational and outplacement assistance. *Id.* All of these elements first outlined in the draft letter of March 22 were included in the final VSO plan that was ultimately approved.

On March 25, 1990, Conway sent Hertenstein an e-mail message indicating that Hertenstein would be receiving comments on the VSO plan from Don Kolowsky, the president of the Special Chemicals division, and Tom Newton. Ex. 16. Conway explained that "[w]e have not given up the hope of taking the issue to the CPC on the 4th April, though it's very tight." *Id.* He

instructed Hertenstein to focus on particular issues regarding the VSO in preparation for an upcoming session, including "claims of unequal treatment, etc." and "legal obligations." *Id.*

The president of the Specialty Chemicals Group, Kolowsky, prepared a confidential document dated March 27 expressing his views on the VSO and how the "Groton 2000 Vision" was to be communicated to the workforce. Ex. HH. He mandated that the letter communicating the changes in Suciac and the VSO omit any implied promise of avoiding layoffs, and listed as a "Problem" with the VSO the fact of "Recent Suciac, Biorecovery, Antibiotic retirees." *Id.* Kolowsky also raised a series of questions about the program, including what classes of employees would be eligible for the program, whether the program should be available to other groups at the Groton facility, questioning the estimates of acceptance, and the viability of other options. In particular, Kolowsky referred to "Brooklyn precedent," a situation at a Brooklyn facility where Pfizer avoided a layoff by "carr[ying] extra people for a considerable amount of time until natural attrition could take effect," Tr. at 748, and the possibility of running "two simultaneous programs" of a sitewide plan for retirement-eligible employees and a VSO of one week pay per year of service for non-retirement-eligible Suciac and Biorecovery employees. *Id.* Kolowsky noted that the latter option would be "[p]ossibly less costly" and would "[p]robably reduce RIF needs." *Id.* Kolowsky did not, however, object to the concept of a VSO, or propose any alternatives that were diametrically at odds with the proposal.

The VSO did not go before the CPC on April 4 as planned; Hertenstein testified at trial that "there were more questions and more modifications were made to the

plan," as exemplified in the questions raised by Kolowsky. Tr. at 744–745. An April 10, 1990 memorandum from Conway to a number of people at corporate as well as the Groton plant management notified them of the scheduling of two meetings in April "regarding the finalization of plans for Groton Suciac... prior to formal presentation to the CPC on May 2." Ex. U. Schachner testified that these meetings involved "various administrative divisions" in the corporate headquarters whose approval was necessary before the VSO proposal could be presented to the CPC. Tr. at 453. On either April 19 "or shortly thereafter," Groton plant management met with corporate representatives to discuss the Groton VSO proposal; the agenda indicates that the attendees were to get an overview of the "Suciac/Anti/Biorecovery Business Situation," "Review Mechanics and Details of Option," and discuss the details of communicating the VSO, both internally within the plant and externally with the media. Ex. N. Although the April 19 agenda also provided a time for the attendees to "Discuss Concerns," nothing in the agenda identifies any substantive concerns or objections to the VSO Plan. Another meeting was held towards the end of April, and on April 26, 1990 Kolowsky forwarded a letter to the CPC describing "the rationale for and broad terms of a voluntary severance program proposed for certain Specialty Chemicals' departments at Groton," and indicating that "[m]ore details with respect to alternatives considered, severance terms, and communications strategy will be presented at the 5/2/90 CPC meeting." Ex. V. Conway testified that this letter was the first formal notice the CPC received of the VSO proposal, although it was possible that individual members of the CPC might have been consulted in preparation of the proposal. Tr. at 910. Finegan testified that Dr. Bloom, the head of central research and a CPC member

who was not present at the May 2 meeting, had expressed some "serious concerns" about whether "Pfizer's image both in the community and with employees" would be damaged by the VSO, although he did not further explain why Dr. Bloom felt that the VSO would have such an impact. Tr. at 719.

A revised packet of information regarding the VSO was distributed by Finnegan to headquarters personnel and plant management on April 27, 1990. Ex. T. Nothing in the terms of the proposed VSO had changed from the draft letter prepared on March 22, 1990, except for the addition of full 1990 vacation entitlement and a Long Service bonus, a lump sum option, and access to Pfizer EAP services. Ex. T. On April 30, 1990, Hertenstein forwarded to Conway some slides he and Finnegan had prepared outlining the need for and parameters of the VSO; these slides were to be used by Conway in his May 2 presentation to the CPC. Ex. JJ; Tr. at 774.

Kolowsky, Conway, and two other individuals from the corporate headquarters presented the VSO proposal at the May 2 CPC meeting. Conway had made numerous proposals to the CPC before and had been very successful; he testified that he "almost invariably got what [he] was looking for" from the CPC. Tr. at 896. Nonetheless, approval by the CPC was considered an "obstacle" that must be rigorously prepared for, and Conway characterized its atmosphere and importance as being "like the star chamber of Pfizer." *Id.* Conway testified that the CPC members discussed the Groton VSO proposal and expressed some concerns regarding it, but the only concern he could specifically identify was CEO Pratt's objections to the informational booklet that Groton management had intended to use as part of its communication strategy. Tr. at 913. The relevant portion of the CPC minutes also

reflect this disapproval of the booklet, but otherwise the description of the discussion at the CPC is terse:

> Mr. Kolowsky proposed that the Committee approve a voluntary severance program that would offer two weeks pay for each year of service up to 52 weeks. The program would reduce the employment from the present 1614 to from 800 to 1000. The program would cost an estimated $3.1 million, but would save annual labor costs of $5.3 million. Mr. Kolowsky noted that the program is being recommended regardless of what is done with citric. After discussion, the Committee approved the proposal . . . .

Ex. X. The VSO was announced to Antibiotic, Biorecovery and Suciac employees in a letter dated May 16, 1990. Ex. 22. Although the May 16 letter did not contain the "NO layoffs" language of the March 22, 1990 draft, the contents of the letter were essentially the same as the draft, including the terms of the VSO.

Although the VSO went through several permutations and was subject to revision and comment on numerous occasions and at various corporate levels, none of the documents or testimony introduced at trial revealed any substantive objection to the concept of a VSO, or disagreements with the business necessity for it at Groton in 1990. No other alternatives to the overstaffing problem resulting from the Suciac elimination were seriously discussed at any stage of the development and approval process. Schachner could not identify anyone within the management structure at corporate headquarters who was opposed to the plan, and he declined to characterize the proposal as "controversial." Tr. at 458. While witnesses for Pfizer emphasized that no one involved in the development of the VSO had the authority to implement the proposal save the CPC, the evidence does not disclose any serious objections to the severance plan at either the plant or corporate level. While Dr. Bloom expressed general concerns about Pfizer's image in the community, the nature of these concerns was not explained at trial, and none of the documents generated over the course of developing and proposing the VSO to the CPC indicate that at any point anyone in Pfizer recommended against adopting the VSO. Nor does the evidence suggest that other alternatives were being weighed along with the VSO; Pfizer witnesses were unanimous in expressing the "Pfizer family tradition" of avoiding layoffs, and no other products were on the horizon to be produced at Groton to employ the excess personnel after the Suciac elimination. While the scope of the program was altered in some insignificant ways from the program originally contemplated by Finnegan, in that it was available to all Antibiotic employees as well, and while fine-tuning had to be done before a final proposal could be presented to the CPC, the record reveals very little disagreement amongst the relevant players at both Groton and the corporate headquarters about the need for and terms of the VSO.

## C. Alleged Misrepresentations to Mullins and Other Employees

The problems with production at the Groton facility were not kept secret from the employees, and rumors regarding potential department shutdowns or downsizing were rife. See, e.g. Tr. at 61–62, 187–88, 355–57. A concomitant workplace rumor circulated regarded the possibility of a supposed "golden handshake" that Pfizer might offer to some employees. Tr. at 188, 357. As the rumors intensified, and the production problems at the facility increased, employees raised these rumors with their supervisors at the regular safety meetings that were held in each department. Tr. at 189, 326, 357.

Four employees besides Mullins testified to the prevalence of these rumors, and the fact that the issue was raised at safety meetings: Mr. Dailey, who worked in the Suciac department; Mr. Jordan, a security officer at Pfizer; Mr. Schroeder, who worked with Mullins in the Biorecovery department; and Mr. Pebbles, who worked in engineering. Mr. Daily testified about management's responses to employee questions about golden handshakes. The responses included those of Mr. Schachner, Mr. Finegan and Mr. Provencher (or responses of lower-level managers made in Schachner, Finegan or Provencher's presence) and always were, in substance, that they knew nothing of any forthcoming offer. Mr. Daily related these responses to the entire period of December 1989 to May 1990, when the offer was made. Mr. Jordan, a Security Officer employed by Pfizer, also recalled the subject of the golden handshake rumors being raised after the regular business of safety meetings was completed, and that Messrs. Finegan and Provencher responded "you guys must know more than we do," which left him (Mr. Jordan) with the distinct impression that no package was coming. Tr. at 327. Mr. Schroeder recalled questions related to a possible golden handshake coming up in discussions related to department meetings, which management answered to the effect "not that they were aware of," leaving him with the impression that nothing was forthcoming. Tr. at 345–46. These exchanges would occur either prior to the meeting, or after the official business of the meeting was completed and it was opened up to questions. None of these employees, however, were able to pinpoint a specific time-frame for these exchanges, except that the rumors were rampant from late 1989 until May of 1990, and that the questions were asked on a regular basis.

Mullins claimed that Schachner and Provencher attended a December 1989 Biorecovery department meeting that was called specifically to address issues regarding possible cutbacks and department downsizing. Tr. at 74. Employees asked questions regarding the possible downsizing of some departments, the possible transfer of some employees, and the rumors about an early retirement package. In response to the question about workplace rumors of a "golden handshake" and whether it looked as if there was going to be an early severance package, plaintiff recalled Schachner as saying "No, there is nothing in sight," confirmed by Provencher, "who said something like, that's correct, there is nothing in sight. Anybody that's waiting for a golden handshake may as well retire because it's not coming." Tr. at 84.

The accuracy of Mullins recollection of this meeting was cast in doubt on cross-examination, where he acknowledged that he could not recall whether Schachner and Provencher spoke immediately after a regular safety meeting or at a special meeting called to address issues regarding downsizing. Tr. at 232. At his deposition, Mullins had testified that the meeting took place in the latter part of 1989—"possibly October, November, maybe even December," Tr. at 230, although his interrogatory responses place the meeting in either November or December. Tr. at 238. At trial Mullins testified that "the month of December sticks out in [his] mind," but the Court finds this recent clarity of recollection problematic, as memories rarely improve in accuracy over time, and his trial testimony contradicted his earlier deposition testimony in specific details, such as the order in which Schachner and Provencher spoke. Tr. at 233. Finally, the agenda and minutes from two October safety meetings were introduced, and they do not reflect such a discussion as occurring. *See* Ex. C, E.

Pfizer does not dispute that "whenever it became aware of an unfounded rumor or supposition among its employees regarding the closing of departments or the offering of severance packages, it denied such rumors." Ex. 24. Schachner confirmed that such rumors were extant at the Groton facility, and that he and a representative of the personnel department had a practice of meeting with small groups of employees to discuss "business realities" in meetings would usually take the place of the regularly scheduled safety meetings. Tr. at 430. During these meetings, Schachner testified, there would be "questioning about whether or not there would be changes in the Pfizer retirement plan to allow people to retire early." Tr. at 429. An agenda from an October 12, 1989 Biorecovery unit "Meeting with Management" indicates discussion about the attendance policy, wage increases, and disability benefits. Ex. E; Tr. at 437. Schachner recalled no specific questions regarding rumors of a golden handshake, and testified that if he had been asked he would have responded "that we would be looking at our manning requirements in an attempt to manage them in a way that was the best possible way for our employees and for the company and that we would consider options that were available to us." Tr. at 444. No testifying employees, however, ever recalled hearing a response that even admitted the possibility of retirement incentives; rather, the general impression these employees received was that no such package was on the horizon. Tr. at 190, 326, 345, 359.

After the meeting with Schachner and Provencher, whether it took place in October, November, or December, Mullins started thinking about early retirement, believing that Pfizer was not going to offer any early retirement incentives. Tr. at 85. Acting on this belief, Mullins filled out the forms to get his preliminary retirement

figures and subsequently met with the designated Personnel Department staffer for retirement benefits, Ms. Sherry Dresback. On February 9, 1990, the same date that Hertenstein recommended the targeted VSO to Schneider, Mullins received his preliminary estimate of retirement benefits, and shortly after receiving this document he discussed his retirement options with Dresback. Ex. 8; Tr. at 87–88. Mullins asked Dresback if "there was anything in sight" in terms of a retirement incentive, to which she responded "no, there is nothing that I know of." Tr. at 88. After this exchange, Mullins concluded that "there wasn't anything coming down the pike," and began thinking seriously about retiring. Tr. at 89. After discussing retirement with his wife, including the monetary penalty he would incur for retiring early, Mullins returned to Dresback on March 7, 1990 to discuss the lump sum option, and again asked whether she had heard anything; Dresback stated that she had not. Tr. at 91. Mullins signed his retirement papers on March 9, 1990, and a memorandum went out from Dresback to members of management, including Schachner, that he would retire effective April 1, 1990. Ex. 9. Mullins' wife had to speak with Dresback on March 20, 1990, when she signed the spousal consent forms, and she was not informed of any upcoming retirement enhancements. Ex. 14; Tr. at 102. This visit came two days before Finegan prepared the first draft of the letter announcing the VSO and explaining its terms to Groton employees. Ex. 14.

While Ms. Dresback did not recall having any discussions with Mullins about "severance packages" or "golden handshakes," she also testified to the volume of inquiries she received on a daily basis and the number of retirements she was processing during the time period. Tr. 866–67. Given the great importance of the

retirement-timing information to Mullins, the Court credits his recollection of events in this regard, as he would be more likely to recall the specifics of such exchanges than a benefits representative who was testifying about events occurring five years earlier, at a time when she was having similar discussions with up to four employees daily. Tr. at 867.

Dresback credibly testified at trial that had she known about the VSO, she would have considered it her duty to inform Mullins of the possibility. Tr. at 881. Finegan, however, testified that he purposefully did not inform her and the other benefits representatives, because he felt that disclosure of the possibility of a VSO would have been "disruptive" to the plant. Tr. at 696. A number of people were inquiring at the personnel office about their retirement benefits, and Finegan assumed that if he had to disclose the VSO to one person, he would have had a duty to disclose it to everyone. Tr. at 710–11. Finegan was not sure that the VSO would be approved by the CPC, and so if he had informed people, he would not have been able to give them any definite information, just that it was under discussion. Tr. at 714. He did not want people making their retirement decisions based on what was, in his view, speculative information, because retirees who chose the lump sum option in Pfizer's existing retirement plan might see their benefits decrease if they waited for a VSO that never materialized, due to changes in the interest rate used to discount such payments. Tr. at 713. The documents generated in the development of the VSO indicated that plant management and corporate considered the possible effect of a VSO on those who had already retired. Finegan's original proposal raised the possibility of offering the VSO to those who had already retired by the time the program was announced, *see* Ex. 7, and Hertenstein's "Pros and Cons"

mentions the option of paying people who had already retired as if they were part of the incentive, Ex. 13, but Pfizer consciously decided against this option. *See* Ex. T; Tr. at 682–83. Pfizer was also aware that people might postpone their normal retirement in hopes of receiving a better deal if they thought that a similar program would be announced in subsequent years, and stated in writing that management should "counter this tendency" by making clear that it had no plans to offer another retirement incentive in the future. Their *own internal manning projections*, however, acknowledged that another voluntary separation incentive program would be needed, and another separation incentive program was eventually offered. Ex. 18; Tr. at 686–87. From the Court's review of the evidence, it is clear that confidentiality of any information about the VSO was at a premium, because management at Pfizer believed any preannouncement disclosure would slow natural attrition and retirements, rendering Pfizer's estimates of the acceptance rate and cost calculations of the VSO inaccurate.

Mullins' last day of work was March 31, 1990 and his retirement was effective April 1, 1990, three days before Conway and Kolowsky had originally anticipated presenting the VSO proposal to the CPC. Tr. at 102; Ex. 16. The VSO was announced on May 16, 1990. *Id.* Mullins was the only Pfizer employee who retired between January 1, 1990 and May 16, 1990 who would have been eligible for the VSO. Tr. at 699.

## II. Conclusions of Law

A. *Pfizer had fiduciary obligations with respect to the VSO even prior to its adoption, and thus was acting in its fiduciary capacity when it spoke to employees about the plan*

█ Pfizer's first line of defense is to argue that because the VSO was a "new"

plan, as stipulated to by the parties, it had no fiduciary duties with respect to that plan until it was adopted. Pfizer relies on the Second Circuit's statement in *Pocchia v. NYNEX,* 81 F.3d 275, 278 (2d Cir.1996) that "[u]ntil a plan is adopted, there is no plan, simply the possibility of one." *Pocchia* adopted a self-described "bright-line rule" that "a fiduciary is not required to voluntarily disclose changes in a benefit plan before they are adopted." *Id.* at 278. The Second Circuit's decision in *Pocchia,* however, does not stand for the proposition that a new plan has no fiduciary duties associated with it until its adoption. The failure to disclose claim in *Pocchia* was made by a beneficiary who made no inquiries regarding future benefit changes, and who acknowledged that he was not seeking such information when he spoke to his benefits counselor.

■ In the Court's view, the holding in *Pocchia* was rather straightforward: if no plan change has been adopted at the time of the beneficiary's retirement, and if the beneficiary has not sought information regarding future plan changes, then an employer has no duty to volunteer any information. Since the trial in this case, there has been significant case law development supporting this limitation on the import of *Pocchia.* The Second Circuit has held an employer's communications about enhanced retirement incentives to ERISA fiduciary standards, even though the plan at issue was considered a "new" plan, rather than an amendment to an existing one. *See Ballone v. Kodak,* 109 F.3d 117, 120 (2d Cir.1997) (communications about new voluntary severance plan that replaced plan under which plaintiffs retired). *Ballone* relied largely on the trust principles enunciated in the Supreme Court's decision in *Varity v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), a case pre-dating *Pocchia* by only three

weeks and which involved the creation of an entirely new company *and* an accompanying new plan. This precedent demonstrates that fiduciary obligations attach to communications about future benefits, notwithstanding the fact that those communications relate to "new" plans. The limitations on a fiduciary's obligations contained in *Pocchia* do not serve to insulate Pfizer's conduct in this case from ERISA review, merely because the VSO was denominated a "new" plan. Accordingly, the Court rejects Pfizer's arguments that it had no fiduciary duties vis-a-vis potential participants in the VSO.

### B. Scope of Pfizer's fiduciary duties

■ Having found that some fiduciary duty exists, the Court must determine the scope of that duty as applied to the evidence adduced at trial. ERISA imposes a fiduciary duty on employers as to their retirement plans to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a). In *Mullins,* the Second Circuit held this duty included an obligation to "not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan." 23 F.3d at 668 (internal citations omitted). While a fiduciary is not required "to be perfectly prescient as to all future changes in employee benefits" or to "to disclose its internal deliberations," *id.,quoting Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 135 (3d Cir.1993) *and Berlin v. Michigan Bell Telephone Co.,* 858 F.2d 1154, 1163 (6th Cir.1988), "when a plan administrator speaks, it must speak truthfully." *Id.*

### 1. Affirmative misrepresentations

■ Pfizer and Mullins disagree primarily about the point at which the consideration of the VSO can be said to have become "serious," and propose varying

standards for making that determination. The Court must first determine, however, whether plaintiff has proved that Pfizer made affirmative misrepresentations to him. *Mullins*, 23 F.3d at 668. While the tone and content of Schachner and Provencher's purported statements at what Mullins claims was a December meeting would constitute material misrepresentations, the Court is not persuaded that plaintiff has met his burden of proving that this meeting occurred as plaintiff related it. His recollection was less than pristine, he could identify no other individuals who were present at the meeting, and no written documentation was produced, compared to the October "Meetings with Management" agenda introduced by defendant. Ex. E.

Mullins' recounting of his conversations with Sherry Dresback, however, had a strong ring of credibility, and were not actually rebutted by Pfizer. She was his benefits representative, and she signed Mullins' retirement documents, thus corroborating that they did meet for retirement planning purposes during the time period claimed by Mullins. While she had no specific recollection of being asked by Mullins about "golden handshakes," she testified that she was discussing retirement options with two to four people a day, and processing between 75 to 100 retirements a year. Tr. at 866–67. Her failure to recall a specific inquiry by Mullins is thus not determinative of whether or not it occurred. Instead, the Court credits Mullins' testimony that he asked Ms. Dresback about the possibility of a VSO, and she responded she had no knowledge of anything at the time.

This statement constituted a failure by defendant to speak truthfully, the literal truth of Dresback's response notwithstanding. In explicating the nature of fiduciary duties under ERISA, courts have found that omissions may be actionable, as well as affirmative statements. *See Pocchia*, 81 F.3d at 279 (employer had fiduciary duty not to make affirmative misrepresentations or omissions). For example, in *Becker v. Eastman Kodak*, 120 F.3d 5 (2d Cir.1997), the Second Circuit found a breach of fiduciary duty based partially on the fact that the benefits counselor failed to provide "complete and accurate information" about the mechanics and timing of the election to retire. In reaching its conclusion the court cited approvingly cases such as *Eddy v. Colonial Life*, 919 F.2d 747 (D.C.Cir.1990) (employer has not only duty not to misinform but also "a duty upon inquiry to convey to a lay beneficiary . . . correct and complete material information about his status and options") and *Bixler v. Central Pennsylvania Teamsters Health and Welfare Fund*, 12 F.3d 1292 (3rd Cir.1993) (failure to advise beneficiary of benefits available to her was breach of fiduciary duty, even when inquiry was limited). Ms. Dresback's response, while undoubtedly a truthful reflection of the state of her knowledge at the time, omitted information known to defendant that was important to Mullins' decision to imminently retire.

■ Of course, Ms. Dresback cannot be faulted for failing to provide information to which she was not privy. It is not Dresback, however, who personally owed any fiduciary duty to Mullins; rather, these duties were owed by Pfizer as plan administrator. Ms. Dresback was Mullins' designated personnel associate, and he reasonably understood that she was the individual he was supposed to consult to receive answers to his questions about benefits and retirement. As Judge Feinberg wrote in the Third Circuit panel decision in *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130 (3rd Cir.1993) (*Fischer I* ), fiduciary obligations "cannot be circumvent-

ed by building a 'Chinese wall' around those employees on whom plan participants reasonably rely for important information and guidance about retirement." *Id.* at 135. Purposefully withholding information from Dresback about the likely forthcoming VSO plan, particularly where she would have considered it her duty to inform Mullins of the possibility of the VSO had she been so informed, will not immunize Pfizer from liability for failing to completely and accurately respond to Mullins' inquiries. Finegan's and Schachner's purposeful decision to keep Dresback ignorant of their discussions was further exacerbated by Pfizer's admitted policy of denying all rumors it viewed as "unfounded" pertaining to the VSO, thus leaving no implication other than that no retirement enhancements were forthcoming. Tr. at 97–99.

The Court is persuaded that misrepresentations have been proved. A fiduciary cannot leave its front-line benefits counselors in the dark, or instruct them to give noncommittal and nonfactual responses to inquiries regarding potential benefit changes, if the information that is withheld is material to beneficiaries. Such a stance is inconsistent with the mandate that a fiduciary discharge its duties with the care, skill, prudence and diligence required by the statute. 29 U.S.C. § 1104(a)(1)(B); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) (pursuant to a fiduciary's duty of loyalty, all decisions regarding an ERISA plan "must be made with an eye single to the interests of the participants and beneficiaries."). While Ms. Dresback's responses may not rise to the level of the affirmative misstatements discussed in *Ballone*, her expressions of ignorance could have the same effect as a positive lie, when an employer has fostered a work environment in which the overwhelming impression created in the minds

of employees is that no retirement enhancements are in the works.

### 2. Materiality of misrepresentations

▮▮▮ The inquiry does not end, however, once misrepresentations by a fiduciary are proved; rather, the Court must analyze whether they were material to the plaintiff. This determination is a mixed question of law and fact, based on whether there is a substantial likelihood that the misrepresentation would mislead a reasonable employee in making an adequately informed decision about if and when to retire. *Mullins*, 23 F.3d at 669. "Whether a plan is under 'serious consideration' at the time a misrepresentation is made is relevant to materiality. All else equal, the more seriously a plan change is being considered, the more likely a misrepresentation, e.g., that no change is under consideration, will pass the threshold of materiality." *Id.* In the Second Circuit, however, serious consideration is not a "bright line" for determining materiality as in other jurisdictions; rather, "an employer's serious consideration of plan changes is but one aspect of the materiality of the alleged misrepresentations, not a prerequisite to the fiduciary's duty to speak truthfully when making disclosures to plan beneficiaries." *Ballone v. Eastman Kodak*, 109 F.3d 117, 125–26 (2d Cir. 1997). The point at which a fiduciary seriously considers offering enhanced retirement incentives still plays an important role in assessing the materiality of any misrepresentations, because the potential change is no longer speculative or remote and thus can have more bearing on an employee's decision-making. Pinpointing "serious consideration" is thus a necessary first step before applying the other factors laid out in *Ballone*. The Court will therefore weigh the evidence presented at

trial to ascertain this significant point in time.

### a) Principles of serious consideration

The concept of "serious consideration" first appeared in *Mullins,* where the Second Circuit aligned itself with two other circuits in concluding that plan fiduciaries have a duty "not to affirmatively mislead participants" regarding future plan changes. 23 F.3d at 669. The *Mullins* court cited to both *Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130 (3rd Cir.1993) (*Fischer I* ) and *Berlin v. Michigan Bell Telephone Co.,* 858 F.2d 1154 (6th Cir. 1988) in reaching its conclusion that serious consideration can often be correlated to materiality. *See id.,quoting Fischer I,* 994 F.2d at 135. Neither *Fischer I* nor *Mullins,* however, clearly articulated what is meant by serious consideration.

The Third Circuit revisited the issue in *Fischer v. Philadelphia Elec. Co.,* 96 F.3d 1533 (3rd Cir.1996) (*Fischer II* ), noting that the concept "recognizes and moderates the tension between an employee's right to information and an employer's need to operate on a day-to-day basis . . . . A corporation could not function if ERISA required complete disclosure of every facet of these on-going activities." *Id.* at 1538. The Third Circuit established a three prong test for determining the point at which an employer's fiduciary disclosure duty outweighs its right to make confidential business decisions. While the Second Circuit has not adopted this test, its reasoned, thoughtful approach provides useful guidance to this Court as fact-finder:

> Serious consideration of a change in plan benefits exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change . . . .

The first element, a specific proposal, distinguishes serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options. A company must necessarily go through these preliminary steps before its deliberations can reach the serious stage. This factor does not mean, however, that the proposal must describe the plan in its final form. A specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal. What is required, consistent with the overall test, is a specific proposal that is sufficiently concrete to support consideration by senior management for the purpose of implementation.

The second element, discussion for implementation, further distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy . . . This factor recognizes that a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits. . . . Consideration becomes serious when the subject turns to the practicalities of implementation. The final element, consideration by senior management with the authority to implement the change, ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy. As noted, large corporate entities conduct regular or on-going reviews of their benefit packages in their ordinary course of business. These entities employ individuals, including middle and upper-level management employees, to gather information and conduct reviews. . . . As a general rule, such operations will not constitute serious consideration. These activities are merely the ordinary duties of the employees. Until senior management

addresses the issue, the company has not yet seriously considered a change.... This focus on authority can be used to identify the proper cadre of senior management, but it should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages. It is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations.

*Id.* at 1539–1540.

Other circuits have since adopted the Third Circuit's formulation, although with some variations. *See, e.g., Vartanian v. Monsanto Co.,* 131 F.3d 264, 268 (1st Cir. 1997). The Tenth Circuit and the Ninth Circuit's formulation and application of the *Fischer II* serious consideration test are particularly pertinent to this case. In *Hockett v. Sun Company,* 109 F.3d 1515, 1523 (10th Cir.1997) the Tenth Circuit concluded that there was "no intersection of the three *Fischer II* factors" until the heads of all departments related to employee benefits, as well as the presidents of both the subsidiary and parent corporation, gathered to discuss a specific voluntary termination proposal. 109 F.3d at 1524. The *Hockett* court also noted that no new cost-analyses or actuarial work occurred prior to this meeting, and "[w]hile cost-analysis or actuarial work is not a necessary prerequisite to serious consideration, it is unlikely that a specific proposal would be sufficiently concrete without some such information." *Id.* at 1525.

In contrast to the rule in *Hockett,* which required the participation of top executives at both the subsidiary and the corporate parent, the Ninth Circuit held in an en banc decision that consideration of retirement incentives by a corporate division's senior management alone could be sufficient to trigger fiduciary duties, if that division was essentially self-managed. *Bins v. Exxon Co.,* 220 F.3d 1042, 1051–52 (9th Cir.2000). Drawing on principles of corporate law, the court noted that in some corporate structures, the corporate parent may function similarly to a board of directors vis-a-vis a division, in that it serves primarily in an oversight role, allowing the division a substantial degree of autonomy and self-management. *Id.* In such a case, the *Bins* court referenced the *Fischer II* caution that serious consideration should not be limited to "deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages." *Id.* (*quoting Fischer II,* 96 F.3d at 1540). Remanding to the district court for a determination of whether the nature of the relationship of the parent to the division was "actively managerial or characterized more properly as one of oversight," *id.* at 1052, the court noted that "[t]he fact that Exxon Corporation may be the only corporate body that 'in a literal sense' can implement benefits changes by placing its imprimatur on a proposal from [division] management should not necessarily push back the date of serious consideration in this case to the date on which the [retirement incentive] proposals landed on desks at Exxon." *Id.* at 1051.

In this Court's view, the Ninth Circuit's approach to the third prong of the *Fischer II* test is better reflective of the realities of differences in forms of corporate governance than the Tenth Circuit's formalistic conception of who constitutes "senior management with authority to implement the

change." The *Hockett* court's recognition that cost estimates or other actuarial analyses are an integral part of developing a "specific proposal" under the second prong of the test, however, is persuasive, as consideration for implementation necessarily involves an inquiry into the bottom line economic effect. The Court will therefore incorporate these refinements on the *Fischer II* test into its analysis of serious consideration.

b) Application of principles to this case

■ The Court concludes that offering enhanced retirement incentives to Suciac and Biorecovery employees was under serious consideration by Pfizer as of February 9, 1990, the date Hertenstein sent his memorandum to Conway recommending the implementation of such a program. Ex. 7. At this point in time, the senior executives at the Groton facility concurred that a separation incentive was the best way to address the problematic overstaffing at Groton in the Suciac and Biorecovery departments, without breaking the Pfizer family tradition of avoiding layoffs. Conway had been kept abreast of Groton plant management's thinking prior to this point, as he was sent Finegan's initial proposal and staffing projections on January 14, 1990, and there is no indication that he ever opposed the VSO, or even recommended material changes in the proposal that he received from Hertenstein. Moreover, the proposal sent to Conway on February 9 was sufficiently specific to constitute serious consideration because it included precise calculations of acceptance rates and total costs. *Id.* While the February 9, 1990 memorandum did not include a full recitation of the proposed VSO's terms, it did include the most relevant and costly terms that formed the core of the finalized program adopted less than three months later: a severance package of two weeks pay per year of service. Ex. 7 at p. 4. The first prong of the *Fischer II* test was met at this point.

That the proposal was sent to Conway for the purposes of implementation, the second factor in the *Fischer II* test, is evidenced by the fact that he was the corporate official most responsible for shepherding the VSO through the CPC, and who prided himself on his "exceptional record" of CPC approvals. The collision between the need to modernize and streamline the Groton facility and the Pfizer tradition of no layoffs also demonstrates that the February 9, 1990 memorandum to Conway was not merely a talking piece, or intended to merely plant the seeds for a particular course of action at some undefined point in the future. In fact, Pfizer's urgency was borne out by the compressed chronology between Finegan's conception of the idea and the CPC's final stamp of approval. While Conway's March 25 e-mail to Hertenstein does recommend some particular areas on which Hertenstein should focus in preparing his presentation for Kolowsky, *see* Ex. 17, and while Kolowsky's memorandum also raised some alternatives to be considered, including a plant-wide program for all retirement eligible employees, neither of these individuals ever expressed any hesitations or objections to the concept of a VSO to address the pressing problems at the Groton facility. Rather, all of the discussions seemed geared towards the best way to secure ultimate approval of the plan, not a substantive debate regarding its merits. The similarity between the proposal that Finegan first articulated in December of 1989 and the program that was ultimately adopted further demonstrates that Pfizer was not speaking in hypotheticals—the VSO was proposed for a specific group of employees and to address a pressing corporate need, and was clearly being targeted for rapid implementation.

Pfizer focuses its argument on the identities of the players in the development of the VSO, and the fact that none of the Groton or Pfizer executives who were heavily involved in the development of the proposals had the authority to actually implement it. By Pfizer's telling, the third factor in the *Fischer II* analysis was only met when Kolowsky forwarded the VSO proposal to the CPC on April 26, 1990. As only the CPC could approve a project of this expense, Pfizer argues, only the members of the CPC could be considered "senior management with the authority to implement the change" in the meaning of *Fischer II*. Pfizer's narrow conception of which executives should fall into this category would limit "serious consideration" to the one-week period between submission to the CPC and that body's May 2 decision approving the VSO. In the Court's view, such restriction of the scope of Pfizer's fiduciary obligations in the present instance misconceives the import of 'serious consideration' as the primary measure of materiality.

First, the limited time devoted to the consideration of the VSO by the CPC belies Pfizer's insistence that the CPC was a rigorous and difficult hurdle for any proposal to surmount. While it might not have been the "rubberstamp" that Mullins believed, the trial exhibits and testimony of the Pfizer witnesses indicates that CPC approval was anticipated. *See* Ex. 14 at 4 (keying communication plan off CPC approval in April); Tr. at 458. Secondly, while the analogy to the corporate-subsidiary relationship is not exact, the evidence introduced at trial demonstrated that the CPC served more of an oversight function rather than playing an actively managerial role in the functioning of the Groton facility. Conway and Kolowsky were "actively managerial," in contrast, and therefore the Court pegs serious consideration at the point at which Conway was presented with

the specifics of the program, the economic justifications for it, and the expenditures involved. Thirdly, the entire tone of all the communications between Pfizer corporate and the Groton managers was more "how can we get this moved through the approval process quickly" rather than "is this a good idea in the first place?" This tone comports with the financial imperatives that were driving the decision-making process. Objections about the VSO were primarily related to the method by which the plan would be communicated to Groton employees, a trend which continued all the way to the CPC, which withheld immediate approval as to only one aspect of the VSO—the communication plan. In light of the fact that the discussions of the proposal were primarily pragmatic rather than deliberative, the fact that the proposal was not before the actual decision-making body until late April 1990 does not require a finding that serious consideration did not occur until then, particularly since the target date for CPC presentation was early April.

As of February 9, 1990, all the managers of the local facility, those with the most specific and expert knowledge of the needs of the Groton facility, concurred in their assessment that there was a pressing need at Groton for a retirement incentive. The plant official's recommendation had been forwarded to the vice president of the division, who was the executive at the corporate headquarters who would be responsible for passing the proposal through the CPC, and who had never seen one of his proposals to the CPC fail. Cost estimates were included in the February 9, 1990 recommendation, and the trial record is barren of any high-level opposition to the VSO plan after the proposal was sent to Conway. While other options were discussed, *see* Ex. 17, and while both Groton and corporate management recognized

some potential downsides to the VSO plan, *see* Ex. 13, these misgivings were primarily about the "hard feelings" of those who would be excluded, and the need to shape the communication strategy carefully. While Pfizer has attempted to implicate approximately 25 other people at the corporate level that it claims were involved in the process, the evidence at trial demonstrated that these individuals had very little impact: they generated no written documents, raised no specific objections, and ultimately left no mark on the product or the process.

At trial, Finegan described the role that these 25 extra individuals played as follows:

> ... my analogy is we painted a very nice picture and each of these [personnel at the corporate level] came along and put their different colors on. By the time it was all done it was a bit of a different picture than when we started.

Tr. at 580–81. From the Court's perspective, the more appropriate artistic metaphor would be a paint-by-numbers kit, with the Groton management and Conway providing the basic outlines and instructions, and the remaining actors simply attempting to paint within the lines of their assigned areas. While a paint-by-numbers set is not a finished painting, by February 9, 1990 the canvas was sufficiently filled in and the ultimate picture sufficiently discernable, such that the final coloration by CPC and other players in the corporate hierarchy did not materially change the picture that emerged. Accordingly, the Court finds that Pfizer had the VSO under serious consideration by February 9, 1990.

Pfizer's alternative formulation of the "serious consideration" test would push back the point at which fiduciary obligations attach until "a plan is proposed in near-final form to the individual or corporate body with decision-making authority as to the adoption of the plan." Proposed Conclusions of Law at 15. Pfizer advocates this "bright line" rule as a way of balancing the employer's interests in keeping its internal deliberations secret with beneficiaries' interests in complete and accurate information. By Pfizer's telling, anything less will result in such uncertainty to employers that they will either overcompensate by providing a barrage of useless information or will resort to layoffs rather than early retirement incentives out of fear of litigation. While such concerns may be legitimate, as the Second Circuit recognized in *Pocchia*, 81 F.3d at 278, the employer's interest in a "final decision-maker" bright line is no greater than the employees' interests in receiving material information when they are making major life decisions. The employer's desire for predictability and certainty must be considered in the context of the policies underlying the fiduciary relationship between the plan and its beneficiaries, and the importance of the decision confronting a long-term employee such as Mullins, who had spent his 35–year working life at Pfizer.

Having applied the factors outlined in *Fischer II*, and the additional gloss provided by *Bins* and *Hockett*, and concluded that Pfizer was seriously considering the VSO proposal as of February 9, 1990, when Hertenstein, on behalf of the Groton plant management, forwarded their recommendation to Conway, the Court now turns to the question of whether Pfizer's failure to disclose this information to Mullins prior to his retirement violated its fiduciary duties.

### 3. Materiality of misrepresentations

 Mullins discussed his retirement options with Sherry Dresback within a few days of the February 9, 1990 Hertenstein memorandum, Tr. at 87, and made his last

inquiry of Ms. Dresback on March 7, 1990, nearly a month after the date the Court has identified as the point of serious consideration. Had Dresback been aware of the circulating VSO proposal, she said she would have considered it her duty to tell Mullins about the possibility, and certainly would not have given Mullins reason to believe nothing was coming down the pike. Finegan deliberately chose not to inform her about the submission of the VSO plan to Conway in order to avoid the possibility of "disruptions." Tr. at 696. Mullins testified that he believed the denials of Ms. Dresback and others, and took them to mean that no enhanced separation package was forthcoming. His testimony that he would have deferred his retirement had he learned of the VSO discussions was unrebutted, and it is easy to credit his testimony that he would have postponed his retirement six weeks until May 16, 1990 had Pfizer fulfilled its fiduciary obligations of providing accurate and complete information to him. There was no evidence of any impediment to his remaining employed at that point.

On consideration of all the facts, the Court concludes that Mullins has proved his claim of material misrepresentations in breach of fiduciary duties, because Pfizer failed to inform its front-line benefits representatives of the VSO discussions after the point at which its consideration of the proposal became serious. Had Ms. Dresback been fully informed of the progress of discussions, she could have told Mullins on March 7 that while nothing was definite, Pfizer had under consideration a retirement incentive which the Groton plant management had recommended to Pfizer corporate. The Court concludes that such information would have been material to Mullins' decision, because there is a substantial likelihood that the failure to provide such information would mislead a reasonable employee in making an adequately

informed decision about if and when to retire. *See Mullins*, 23 F.3d at 669. By establishing Ms. Dresback as the appropriate contact person for plaintiff's benefit inquiries, and then failing to provide her with complete and accurate information regarding Pfizer's future plans, Pfizer induced Mullins to rely upon Ms. Dresback, and then purposefully closed her off from the company's deliberations. Combined with the misinformation campaign aimed at denying all rumors, Ms. Dresback's assertions of ignorance reasonably led Mullins to believe that no plan was forthcoming. While Mr. Finegan may have been legitimately concerned about the "disruption" that would ensure were the information made public, at the point at which Pfizer's consideration of the proposal became serious its fiduciary obligations trumped its desire for secrecy and its interest in limiting the VSO to employees who would not have otherwise retired. A "play-by-play" of the deliberations was not required, as Pfizer could certainly have limited the information it disclosed to the fact that some sort of retirement enhancement for certain segments of the population was being considered. But Pfizer could not drop a veil of secrecy over all its deliberations and still comport with its fiduciary obligations under ERISA and the interpretive case law.

### III. Conclusion

For the reasons outlined above, the Court concludes that Mullins has proved his claim that Pfizer breached its fiduciary duties to him when it failed to inform him about the possibility of the VSO. Judgment in plaintiff's favor in the amount of $39,000 will enter.

IT IS SO ORDERED.