United States Court of Appeals,

Fifth Circuit.

No. 94-30618.

Warren A. MAHER, et al., Plaintiffs-Appellants, Cross-Appellees,

v.

STRACHAN SHIPPING COMPANY, et al., Defendants-Appellees, Cross-Appellants.

United States of America, Intervenor.

Nov. 14, 1995.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before POLITZ, Chief Judge, and JONES and PARKER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

When this class action was filed in 1992, the applicable ERISA statute of limitations, 29 U.S.C. § 1113 (1987), barred cases six years after the breach occurred and three years after the earliest date on which a plaintiff "had actual knowledge of the breach or violation ..." The district court found that the plaintiffs' knowledge in 1987 that Strachan had purchased Executive Life annuities to replace their former retirement benefits plan tolled the three year statute of limitations period and time-barred their claims. Accordingly, the central issue on appeal is whether the information known by the class members three years before the date suit was filed amounted to "actual knowledge of the breach or violation" for purposes of § 1113(2)(A). We hold that for summary judgment purposes, it does not, and the lower court's grant of summary judgment must be reversed. We also reject Strachan's

1

challenge to the impact of the Pension Annuities Protection Act of 1994 on appellants' standing.

BACKGROUND

Strachan Shipping Company ("Strachan") was the employer sponsor of a qualified retirement plan subject to the provisions of ERISA (the "Plan"). The Plan was a defined benefit plan established to provide retirement benefits for Strachan's employees and their beneficiaries. Strachan administered the Plan through its appointed retirement board, of which defendants/appellees Robert W. Groves III and Edwin L. Ennis were members. Groves was chairman of the board of directors as well as a member of the board's compensation committee. Ennis was the secretary/treasurer of Strachan and also served on the compensation committee. All appellees were fiduciaries of the plan.

By memorandum dated December 26, 1986, Ennis informed plan participants and beneficiaries that the plan was being reorganized. On April 17, 1987 and July 15, 1987, memoranda from Ennis advised plan participants and beneficiaries that the plan's reorganization was "designed to allow the company to utilize excess assets which have accumulated in the pension plan." The parties were assured that their benefits would not be "diminished in any way by this reorganization."

Shortly afterward, Strachan agreed to purchase a group single premium annuity contract from the now-infamous Executive Life for approximately $10,750,000 to cover the plan participants' benefits. As a Result of this purchase and the plan's termination, Strachan

2

received a cash reversion of over $4,500,000.[1]

On November 1, 1987, Executive Life began paying monthly benefits to former plan participants and beneficiaries who were in pay status. The checks were in the same amounts as the checks previously received by beneficiaries, but they indicated that Executive Life was now the payor. Participants who were not in pay status first received their Executive Life Annuity Certificates from Strachan in May of 1989, along with a memorandum from Strachan informing participants that their benefits had been secured with "the purchase of a Group Annuity Contract from Executive Life Insurance Company."

On April 11, 1991, Executive Life was placed into conservatorship by the California Commissioner of Insurance. The Commissioner immediately reduced participants' annuity payments by thirty (30) percent. In August, 1992, appellants filed a class action pursuant to Section 502(a) of ERISA, 29 U.S.C. § 1132(a), against Strachan and its officers alleging a breach of their fiduciary duties to plan participants and beneficiaries.[2] *See*

---

[1]The plan was a "defined benefit plan," under which the risk of loss or gain associated with plan investments remained entirely with Strachan. When such a plan terminates, assets in excess of plan liabilities revert to the plan sponsor if plan language permits, which it did in this case.

[2]The district court certified a plaintiff class which includes all participants of Strachan's former pension plan who resided in Louisiana in April 1991 and who hold Executive Life annuities. Participants in states having a state guaranty fund in place in April 1991 received their full annuity payment through supplementation. Louisiana had no state guaranty fund, and the plaintiff class members in pay status are therefore not receiving such supplementation.

3

ERISA §§ 404(a)(1)(A) and (B), § 403(c)(1), 29 U.S.C. §§ 1104(a)(1)(A) and (B), and § 1103(c)(1).

The district court granted summary judgment to Strachan, holding that appellants had no standing or remedy under ERISA and that their suit is barred by the three-year statute of limitations. According to the court, the appellants were put on notice and had actual knowledge of the breach when Strachan purchased the Executive Life annuities. The court emphasized that some of the members of the plaintiff class had indicated some "concern" about Executive Life more than three years before filing suit. And, for a similar period, some of the class had known that the plan's termination would enable Strachan to take an enhanced reversion because of Executive Life's low bid.

After receiving the initial adverse judgment, the class moved for relief based on the October 22, 1994, passage of the Pension Annuitants Protection Act, which amended Section 502(a) of ERISA to make clear that annuitants have standing to obtain relief for violations of ERISA in connection with annuity purchases. Applying the amendment, the district court issued an order granting the plaintiffs' motion as to standing but reiterating the statute of limitations bar.

STANDARD OF REVIEW

This court reviews a district court's granting of summary judgment *de novo,* applying the same standard as the district court. *Dupre v. Chevron U.S.A.,* 20 F.3d 154, 156 (5th Cir.1994). Summary judgment is proper if there is "no genuine issue as to any material

4

fact" and the movant, Strachan, is entitled to judgment as a matter of law.  Fed.R.Civ.Proc. 56(c); *Green v. Touro Infirmary,* 992 F.2d 537, 538 (5th Cir.1993).

## DISCUSSION

A. Statute of Limitations

The ERISA statute of limitations is keyed respectively to the date the cause of action arose and the date the plaintiff had actual notice.  *Hogan v. Kraft Foods,* 969 F.2d 142, 145 (5th Cir.1992).  The statute specifies a two-step analysis of accrual of an ERISA action:  first, when did the alleged breach or violation occur;  and second, when did the plaintiff have actual knowledge of the breach or violation?  *Ziegler v. Connecticut General Life Ins. Co.,* 916 F.2d 548, 550 (9th Cir.1990).

In this case, Strachan's selection process for an annuity provider ended on August 6, 1987, with the signing of a Letter Agreement with Executive Life to purchase a group annuity contract. Both sides acknowledge that the alleged breach occurred on that date. *Ziegler,* 916 F.2d at 551 (the culpability resulting from the breach of ERISA fiduciary duty arises with the contract's creation).  Under the first step of analysis, the Maher class filed their action within six years of August 6, 1987.

The second step requires a determination whether the class had actual knowledge of the breach more than three years before the complaint was filed.  Because suit was filed in August 1992, the claim is time barred only if appellants had actual knowledge of the breach before August 1989.  As to both participants in the Plan and

5

beneficiaries in pay status, the district court equated mere knowledge of Strachan's purchase of annuities from Executive Life with actual knowledge of the alleged breach of fiduciary duty. Each group had actual knowledge early enough to bar their claims under this analysis.

This court recently adopted a test articulated by the Third Circuit for applying the three-year time bar. *Reich v. Lancaster,* 55 F.3d 1034, 1057 (5th Cir.1995) (district court did not err in finding tax forms did not provide plaintiffs actual knowledge of breach of fiduciary duty or ERISA violation). The Third Circuit held:

> [a]ctual knowledge of a breach or violation requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm.

*Gluck v. Unisys Corp.,* 960 F.2d 1168, 1177 (3d Cir.1992).

Later, the Third Circuit elaborated its formula; stating:

> [actual knowledge] requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim for breach of fiduciary duty or violation under ERISA.

*International Union v. Murata Erie North America,* 980 F.2d 889, 900 (3rd Cir.1992). Based on this test, the Third Circuit held that the defendant fiduciary failed to make the showing of actual knowledge necessary to meet the "stringent requirement" imposed by ERISA § 413(2), 29 U.S.C. § 1113(2). *Id.* at 901.

Application of this actual knowledge standard makes it difficult to conceive how appellants' claims would be barred as a matter of law by their knowledge of the transfer of plan assets

into an annuity contract with a company that received some unfavorable publicity. The Ninth Circuit recently dealt with a similar issue in *Waller v. Blue Cross of California,* 32 F.3d 1337 (9th Cir.1994), which involved the termination of an ERISA plan replaced by annuities purchased from Executive Life.[3] The court declined to equate plaintiffs' knowledge of the purchase of annuities with actual knowledge of the alleged breach of fiduciary duty, reasoning that the disclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of an underlying breach. *Id.* at 1341, citing *Fink v. National Savings and Trust Co.,* 772 F.2d 951, 957 (D.C.Cir.1985).

In reaching its finding there was no genuine issue of fact that the class obtained actual knowledge of the breach of fiduciary duty no later than May 19, 1989, when those not in pay status received their Executive Life Annuity Certificates from Strachan, the district court noted that there was a "general concern over the stability of Executive Life [in 1987]." Strachan also relies heavily upon deposition testimony of several of the named class

---

[3]Although this case is factually very similar to the case *sub judice,* we note the different underlying procedural postures. *Waller* came before the Ninth Circuit on a 12(b)(6) motion, while we are presented with the issue on a grant of summary judgment. The *Waller* court noted, "[b]ecause this case was dismissed for failure to state a claim, all allegations of material fact in plaintiffs' complaint are taken as true and construed in the light most favorable to the plaintiff." *Waller,* 32 F.3d at 1338, n. 1. The standard on summary judgment review, however, requires us to look at the evidence adduced by both sides. Nevertheless, the determinative issue in both cases is whether the plaintiffs had obtained actual knowledge of the alleged breach when they learned the defendant employer had purchased annuities from Executive Life.

plaintiffs, seven of whom expressed concern about Executive Life's financial well-being or knowledge of the selection of Executive Life as early as 1987 or 1988. For example, appellant Armstrong testified that he had concerns about Executive Life in early 1988; that he gained this knowledge through articles that had been published about the insurance carrier's troubled times; that he knew Executive Life had been selected because it was the low-bidder, giving rise to the greatest reversion to Strachan; and, that he had discussed these doubts with defendant Ennis. Appellant Collins testified to having read articles about Executive Life's problems before August 1987, and he had discussed these concerns with appellant Maher and appellee Ennis. Appellant Maher testified in deposition to having read a *Wall Street Journal* article about Executive Life's junk bond dealings and that he had asked Strachan's John MacPherson to guarantee his pension. Additionally, appellants Mintz, Maniglia, and Higgens testified to knowing of Executive Life's selection before the actual August 1987 signing, and appellant Tomeny knew that a lunch meeting had occurred at which several of these concerns had been aired by the appellants to Strachan's management.

Although this testimony demonstrates unease with the choice of Executive Life, it does not, in our view, show to the exclusion of a genuine fact issue that appellants had actual knowledge of the facts necessary to understand that some claim existed, knowledge of the harmful effect the purchase of Executive Life would have, or knowledge of any actual harm prior to August 24, 1989. *Reich v.*

8

*Lancaster,* 55 F.3d 1034, 1057 (5th Cir.1995) (citing *Gluck v. Unisys Corp.,* 960 F.2d at 1177). *Waller, supra.* "It is not enough that [appellants] had notice that something was awry, [they] must have had specific knowledge of the actual breach of duty upon which [they] sue[ ]." *Brock v. Nellis,* 809 F.2d 753, 754 (11th Cir.1987). *See also Radiology Center, S.C. v. Stifel, Nicolaus & Co.,* 919 F.2d 1216, 1222 (7th Cir.1990).[4] The class representatives' information, of course, does not prove that other class members had any awareness of articles about Executive Life's financial stability. But even as to the named class members, there is no evidence that they had actual knowledge about Executive Life's actual financial condition beyond predictions in the financial press. We are hesitant to hold that actual knowledge of a fiduciary breach or violation may exist simply because of unfavorable publicity surrounding a company, unless the publicity itself relates to facts rather than predictions of the company's adverse condition.

We also reject Strachan's argument that knowledge of the transaction, *i.e.* the purchase of Executive Life Annuities, is

---

[4]Mere notice of the Executive Life purchase was not notice of an ERISA violation or even grounds for believing something was "awry." The purchase of an annuity from an insurance company is not a *per se* violation of ERISA. The Act permits plan sponsors to terminate plans, replace plan benefits with annuities, and recapture the remaining plan assets to the extent contemplated by the plan's governing documents. ERISA §§ 4041(b)(3)(A) and 4044(d)(1), 29 U.S.C. 1341(b)(3)(A) and 1344(d)(1). The appellants cannot be charged with actual knowledge of an ERISA violation based upon their awareness of events which the Act permits. *See Waller,* 32 F.3d at 1341.

enough by itself to trigger the three-year statute of limitations.[5] Inasmuch as appellants are challenging the actual selection of Executive Life, they must have been aware of the process utilized by Strachan in order to have had actual knowledge of the resulting breach of fiduciary duty.[6] *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984) ("The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed."). *See also Fink v. National Sav. and Trust Co.,* 772 F.2d 951, 957 (D.C.Cir.1985). The deposition testimony clarifies what appellants did *not* know about Executive Life's selection by Strachan. Armstrong stated he had no personal knowledge of any facts to indicate that Strachan had breached its fiduciary duty. Collins testified that he had no knowledge beyond the shortage of his annuity contract to suggest appellee had failed to act prudently, diligently, and solely in the

---

[5]Strachan mixes apples and oranges in its argument that knowledge of the transaction amounts to actual knowledge sufficient to trigger the statute. The transaction does toll the statute, but this in turn does not automatically translate to actual knowledge of a breach. *See Martin v. Consultants & Admrs., Inc.,* 966 F.2d 1078 (7th Cir.1992); *International Union v. Murata Erie North America,* 980 F.2d 889 (3rd Cir.1992); *Blanton v. Anzalone,* 760 F.2d 989 (9th Cir.1985); *Larson v. Northrop Corp.,* 21 F.3d 1164 (D.C.Cir.1994); *Tassinare v. American Nat. Ins. Co.,* 32 F.3d 220 (6th Cir.1994).

[6]The appellants' claim in this respect is predicated upon the appellants' charges under 29 U.S.C. §§ 1103(c)(1) and 1104(a)(1)(A), ERISA §§ 403(c)(1) and 404(a)(1)(A), whereby the defendant fiduciaries were required to act solely in the interest of the plan's participants and beneficiaries and for the exclusive purpose of providing benefits to them, and 29 U.S.C. § 1104(a)(1)(B), ERISA § 404(a)(1)(B), the prudent person fiduciary standard.

10

interest of the plan participants.  Maher did not know the steps taken by Strachan to investigate the risks of purchasing Executive Life annuities.  And Tomeny, Maniglia, Higgens, and Mentz were unaware of Executive Life's low bid or the reasoning behind the selection.  The summary judgment evidence to date indicates appellants' collective awareness only of Executive Life's selection and negative publicity, cursory discussions with and one letter to Strachan's management, and a refusal to guarantee a pension.  These facts, taken with the information that Strachan made available about Executive Life's selection, and the evidence that no pecuniary loss was suffered until April 1991, strongly suggest that the class did not have actual knowledge of a breach or violation before August 1989.  Even recognizing the difficulty in determining in the abstract precisely what constitutes actual knowledge of a breach or violation, these facts do not seem sufficient to show it. *See also Martin v. Pacific Lumber,* 1993 U.S.Dist. LEXIS 660 (N.D.Cal. Jan. 15, 1993) (no limitations bar under similar facts pertaining to Executive Life).[7]

Because of this conclusion, we reject Strachan's request to decertify the class or to permit it to investigate the claims of all class members to determine if adequate class representatives can be found.  *See Intern. Woodworkers v. Chesapeake Bay Plywood,* 659 F.2d 1259, 1270 (4th Cir.1981);  *Keasler v. Natural Gas*

---

[7]The parties cite two different proceedings arising from the same *Pacific Lumber* case.  We cite from the court's order denying defendants' motion for summary judgment asserting that the ERISA claim was time barred.

11

*Pipeline Co. of America,* 84 F.R.D. 364, 367-68 (E.D.Texas 1979); *In Re Plywood Antitrust Litigation,* 76 F.R.D. 570, 586 (E.D.La.1976).

B. Pension Annuitants Protection Act of 1994 ("PAPA")

The district court originally held that the class lacked standing to sue because appellants, having already received annuities to replace the plan, were no longer participants or beneficiaries of the plan at the time they brought suit. The court reversed itself on this issue a few days after the PAPA was signed into law. Section 2 of PAPA expressly amends Section 502(a) of ERISA to permit "any individual who was a participant or beneficiary at the time of" the breach of a fiduciary duty to bring a civil action

> in the event that the purchase of an insurance contract or insurance annuity in connection with the termination of an individual's status as a participant covered under a pension plan ... constitutes a violation of [ERISA]....

Pub.L. No. 103-401, 108 Stat. 4172 (1994). PAPA specifies that this amendment applies to "any legal proceeding pendings, or brought, on or after May 31, 1993." Pub.L. No. 103-401, 108 Stat. 4172 (1994). Strachan admits that PAPA clearly dictates the appellants' standing but argues that in doing so, the provision violates the constitutional separation of powers doctrine by directing the court to decide this case in a particular manner without changing underlying ERISA law.

Strachan's argument fails on several grounds. First, isolated statements in the legislative history, particularly those speaking to the motives of individual legislators, are not relevant

12

to the issue of what Congress actually did.[8] *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 589, 105 S.Ct. 3325, 3337, 87 L.Ed.2d 409 (1985); *Walker v. United States Dep't. of Housing & Urban Dev.,* 912 F.2d 819, 830 (5th Cir.1990).

Second, Strachan's claim that the PAPA represents an unconstitutional attempt by Congress to "require courts to reach particular conclusions of law in cases without changing the underlying law," contrary to the separation of powers doctrine set forth in *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), ignores the Court's recent explanation of the doctrine. In *Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992), the Court unanimously decided that *Klein* does not restrict Congress's power to change the law applicable to cases pending in the courts even if it overrides the effects of already rendered decisions. The legislation was upheld because it "compelled changes in the law, not findings of results under the law." *Id.* at 437, 112 S.Ct. at 1413. The effect of PAPA is similar and requires a similar result.

The Ninth Circuit has already characterized the amendment as a clarification of existing law rather than a change of law. The purpose of the clarification, however, was to attribute standing

---

[8]Strachan cites particular portions of the legislative history to support its position that the PAPA was not intended to change the law but to correct a mistaken interpretation of ERISA standing requirements employed in some federal courts. *See* H.R.Rep. No. 872, 103d Cong., 2nd Sess. (1994), 1994 WL 702776, at *97; 140 Cong.Rec. H10621-22 (daily ed. Oct. 3, 1994) (statement of Rep. Williams); H.R.Rep. No. 872, 103d Cong., 2nd Sess. (1994), 1994 WL 702776, at *96.

not only to annuitants in pending cases but to those in future cases as well.  The legislation was properly called an "amendment" to ERISA.  The PAPA does not encroach on the domain of the judiciary.  See *Kayes v. Pacific Lumber,* 51 F.3d 1449 (9th Cir.1995).

CONCLUSION

For the reasons discussed above, the judgment of the district court is reversed and the case remanded for further proceedings consistent herewith.

REVERSED and REMANDED.