Anthony R. CAPUTO; David A. Cook; Paul B. Pebbles; Duncan B. Robertson, Plaintiffs–Appellants,

v.

PFIZER, INC., Defendant–Appellee.

Docket No. 00–7483.

United States Court of Appeals, Second Circuit.

Argued Nov. 28, 2000.

Decided Oct. 9, 2001.

Thomas G. Moukawsher, Moukawsher & Walsh, LLC, Groton, CT, for Plaintiffs–Appellants.

Jonathan B. Orleans, Zeldes, Needle & Cooper, P.C., Bridgeport, CT (Douglas J. Varga, of counsel), for Defendant–Appellee.

Before: McLAUGHLIN, POOLER, and KATZMANN*, Circuit Judges.

Judge POOLER concurs in part and dissents in part in a separate opinion.

McLAUGHLIN, Circuit Judge:

This is the latest chapter in the "golden-handshake" extended to certain employees when defendant Pfizer Inc.'s ("Pfizer") Groton, Connecticut plant (the "Groton Plant") downsized. We are compelled to interpret the enigmatic—almost chimerical—statute of limitations that applies to actions for breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1113.

Plaintiffs are four senior citizens who worked for Pfizer for many decades. In the late 1980s when Pfizer made the decision to downsize, the plaintiffs were dissuaded from postponing their retirement. What they did not know was that generous severance packages would be announced in the months to come. Alleging that they were misled and would never have retired so soon had they known the true state of affairs, they sued under ERISA. Invoking the three- or six-year statute of limitations (depending on how 29 U.S.C. § 1113 is interpreted), the defendant moved for summary judgment. The district court held that the three-year period applied and that more than three years had passed since the plaintiffs knew, or should have known, that they had been snookered. Accordingly, summary judgment was granted and no leave was granted to amend the complaint. We conclude that the district court acted too precipitately.

## BACKGROUND

In the late 1980s, management at Pfizer ordered the Groton Plant management team to take immediate steps to increase efficiency and productivity. J. Robert Schachner, the Groton Plant manager, Barton Finegan, Director of Employee and Community Relations, and Kerry Hertenstein, the assistant plant manager, developed a detailed strategy to achieve this mandate. It included shutting down inefficient production lines, investigating new product lines, downsizing the workforce and retraining the remaining employees. They called this ten-year realignment plan "Groton 2000."

In December 1989, the Groton Plant management team decided that the first step would be to eliminate its Suciac Division, an outdated and inefficient citric acid manufacturing operation. Recognizing that such a move would result in "excess personnel," and clinging to the "Pfizer tradition" of not firing its employees, Finegan proposed offering employees in the Suciac and related Biorecovery departments a "special opportunity program" called a

---

* The Honorable Christopher F. Droney, of the United States District Court for the District of Connecticut, originally a member of the panel sitting by designation on November 28, 2000, recused himself prior to oral argument and did not participate in this appeal. Judge Robert A. Katzmann was appointed as the third member of the panel on February 22, 2001, pursuant to 2d Cir. R. § 0.14(b).

Voluntary Separation Option ("VSO"). The VSO offered additional pension benefits as an early retirement incentive. The Groton Plant management team could not implement the VSO, however, without permission from the corporate management committee (the "CPC") in New York. Thus, in January 1990, a parade of memoranda and presentations began its journey up the corporate ladder. Notable among the materials presented were: (1) a discussion of the pros and cons of the planned VSO; and (2) projected manning levels for the years 1990–1994.

It seems that Plant management foresaw that Groton's remaining citric acid operations and penicillin production would likely be shut down in early 1992, thus requiring another significant downsizing of the employee population. Plant management hoped to achieve this downsizing as much as possible through attrition. It recognized, however, that the very announcement of the 1990 VSO would encourage the affected employees to postpone retiring in the hope of receiving a similar "golden handshake." It therefore proposed to "counter this tendency by stating in [its] communications that [Groton] ha[s] no plans to offer another such program in the foreseeable future." As the manning projections reflected, however, if the citric acid and penicillin operations were shut down, Groton did indeed intend to offer yet another even larger VSO.

Corporate management kept a weather eye on the way the "Groton 2000" plan played to the troops. It ordered Schachner to remove the promise of "NO layoffs" from a draft letter to the employees. In May 1990, Schachner circulated among plant managers a booklet entitled "Groton 2000. Challenges to Change: the Road to Competitiveness" outlining the realignment strategy. It stated that the first "critical action" to be taken was to "reduce

the number of employees in the Plant *considerably* over the next ten years ... through attrition [and] a special opportunity program." Significantly, this booklet was *not* distributed to employees. The copy of "Groton 2000" that was ultimately distributed to employees was altered to state that the "number of employees will be *gradually* reduced"—rather than "considerably"—and all references to a "special opportunity program" were deleted.

Indeed, Groton managers decided not to tell even the plant's benefits counselor, Sherry Dresback, about the initial VSO until it was formally announced on May 16, 1990. Thereafter, benefits personnel and foremen were instructed to respond to rumors or questions from employees about possible future "golden handshakes" by saying that they knew of no such thing.

On numerous occasions from August 1990 through March 1991, plaintiff, Anthony R. Caputo, a mechanic trade oiler in the Engineering Department at Groton, allegedly asked his supervisors, Norm Vargas, John Tassone and George Simpson, and Groton's human resources representatives, Sherry Dresback and Mary Lou Nowack, for any information they might have about the possibility that a VSO might be offered to Engineering Department employees. On each occasion, Caputo claims that those asked said they had no knowledge of any such plan. Caputo retired from Pfizer, after 36 years of service, on April 1, 1991.

In November and December 1990, plaintiff, David A. Cook, an instrument technician/assistant foreman in the Engineering Department at Groton, allegedly asked his supervisor, Norm Vargas, and Dresback whether a retirement enhancement package was being considered for his department. Cook claims that Vargas said nothing was coming in the way of early retirement enhancements and Dresback said there were no early retirement

packages in sight for engineering personnel. Cook retired from Pfizer, after 37 years of employment, on January 1, 1991.

From May 1990 through February 1991, plaintiff, Duncan B. Robertson, a day foreman in the Fermentation Department at Groton, allegedly asked personnel officials Ralph Hightower and Ronald Provencher, as well as various human resources personnel, whether any more VSOs would be offered in the future. The answer, he claims, was always no. In particular, at a May 1990 meeting with the Suciac Department (where he worked at the time but did not have enough retirement points to take advantage of the May 1990 VSO), Robertson alleges that Hightower and Provencher told all attendees that "no other VSO would be offered in the future—it was a once in a lifetime package." Robertson retired on March 1, 1991, after 34 years of service.

On various occasions from March through May 1991, plaintiff, Paul B. Pebbles, a millwright in the Engineering Department at Groton, allegedly asked Schachner, Provencher and Nowack whether there was any chance of a golden handshake in the near future. The answer was always no. According to Pebbles, Schachner went so far as to say: "Paul, you will never live long enough to see a golden handshake." Pebbles retired, after 33 years of employment, on June 1, 1991.

Meanwhile, Groton Plant management had been planning the next phase of its Groton 2000 plant realignment. Various budget manning tables were produced forecasting the positions to be eliminated in each department. For instance, as of August 1990, five layoffs were already planned for the Engineering Department in 1991.

On April 29, 1991, Pfizer issued an "Info Pipeline" newsletter to all employees advising them that, beginning in September 1991, the Groton Plant would no longer manufacture penicillin, resulting in a possible 40—50 person reduction in personnel in the Antibiotic Department. It noted, however, that these employees would be transferred to other positions. According to Pfizer, it decided in the early fall of 1991 to cease citric acid production at Groton as well, by the end of the year.

Because the manufacture of new products could not absorb the "excess" employees, Groton Plant management asked Pfizer for permission to offer another VSO targeted at the employees in the affected departments. Pfizer claims that permission was first requested via a proposal dated September 18, 1991 and was granted by the CPC on November 6, 1991. But a letter submitted with that proposal indicates that Groton Plant management had already made changes to the original proposal upon corporate management's request ("We have reviewed our initial proposal as requested, and we have developed an alternative approach which we believe will best serve the needs of the plant"). Further, if the CPC first heard of the proposal in mid-September as claimed, this approval process moved at lightning speed as compared to the five months it took to obtain approval of the May 1990 VSO.

The VSO was formally announced on November 11, 1991. Caputo, Cook, Pebbles and Robertson learned of the VSO shortly thereafter, and confirmed that they would have been eligible for it had they not retired. Although they suspected that management had been fudging it when it denied that such a package was going to be offered, they did not know that any individual had knowingly lied to them. In 1995, they learned about a case being tried in the United States District Court for the District of Connecticut in which James Mullins, a former Laboratory Technician who retired from the Groton Plant in April

1990, was suing Pfizer for misleading him about its plans to offer the May 1990 VSO.

Mullins had filed suit in the District of Connecticut in October 1990. The action was tried before a jury in 1995 and evidence of the management meetings, budgets, manning projections and strategies discussed above was presented. After a four-day trial, the jury returned a verdict in favor of Mullins. The verdict was vacated, however, after this Court decided in *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251 (2d Cir.1996), that there is no right to a jury trial in a suit to recover ERISA benefits.

The case was retried to the district court which held that Pfizer breached its fiduciary duties to Mullins when it failed to inform him about the possibility of the May 1990 VSO. *Mullins v. Pfizer, Inc.*, 147 F.Supp.2d 95 (D.Conn.2001). In a lengthy opinion containing detailed findings of fact, the district court disabused the parties of the belief that a silent mouth never did any harm:

> By establishing Ms. Dresback as the appropriate contact person for plaintiff's benefit inquiries, and then failing to provide her with complete and accurate information regarding Pfizer's future plans, Pfizer induced Mullins to rely upon Ms. Dresback, and then purposefully closed her off from the company's deliberations. Combined with the misinformation campaign aimed at denying all rumors, Ms. Dresback's assertions of ignorance reasonably led Mullins to believe that no plan was forthcoming.... A "play-by-play" of the deliberations was not required, as Pfizer could certainly have limited the information it disclosed to the fact that some sort of retirement enhancement ... was being considered. But Pfizer could not drop a

veil of secrecy over all its deliberations and still comport with its fiduciary obligations under ERISA.... [1]

Not surprisingly, in October 1996, Caputo, Cook, Pebbles and Robertson retained Mullins's attorney and filed the instant action against Pfizer in the United States District Court for the District of Connecticut. The complaint alleged that Pfizer fraudulently induced them to retire and thereby deprived them of benefits under the 1991 VSO in violation of ERISA. Pfizer moved for summary judgment on the ground that the plaintiffs' claims were time barred. Plaintiffs filed a cross-motion for summary judgment on the merits.

The district court granted Pfizer's motion and denied plaintiffs' cross-motion as moot. Specifically, the court held that: (1) plaintiffs' claims were barred by the three-year statute of limitations under ERISA § 413(2), 29 U.S.C. § 1113(2), because they had "actual knowledge" of Pfizer's alleged breach of fiduciary duty when they learned that the VSO was announced in November 1991; and (2) plaintiffs were not entitled to the 6 year statute of limitations for actions involving "fraud or concealment" because their complaint failed to plead fraud with the requisite particularity under Fed. R.Civ.P. 9(b). *Caputo v. Pfizer, Inc.* 89 F.Supp.2d 237 (D.Conn.2000). The court denied plaintiffs' request for leave to amend as futile, holding that plaintiffs produced "no evidence that Pfizer even considered to offer the VSO while the plaintiffs were employed by Pfizer." *Id.* at 240.

Plaintiffs now appeal, arguing that the district court erred because: (1) their claims are not subject to the three-year statute of limitations; (2) even if they were, they did not have the "actual knowledge" of the breach of fiduciary duty necessary to trigger this limitations period

---

1. Pfizer's appeal from this decision is currently pending.

until September 1995 when they learned of the evidence in the *Mullins* trial; and (3) they should have been granted leave to amend their complaint to adequately plead fraud, thereby bringing their claims within the six-year statute of limitations.

For the reasons set forth below, we vacate the grant of summary judgment and remand the action to the district court.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*, examining the evidence in the light most favorable to, and drawing all inferences in favor of, the non-movant. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 40–41 (2d Cir.2000). Summary judgment is appropriate only if the admissible evidence establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

Held together by chewing gum and baling wire, the statute of limitations for breach of fiduciary duty actions brought under ERISA provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

*except that in the case of fraud or concealment, such action may be com-*

*menced not later than six years after the date of discovery of such breach or violation.*

29 U.S.C. § 1113 (emphasis supplied).

### A. *The "Fraud or Concealment" Exception*

■ Relying on this Court's decision in *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 919 (2d Cir.1989) ("*Diduck I*"), plaintiffs argue that their breach of fiduciary duty claims involve allegations of common-law fraud, and therefore earn the six-year "fraud or concealment" period rather than the three-year "actual knowledge" limitations period. Pfizer, however, contends that the "fraud or concealment" provision applies—not to actions for breach of fiduciary duty in which the underlying action itself sounds in fraud (i.e., looking to the nature of the factual allegations supporting the claim for breach of fiduciary duty)—but only to actions in which the plaintiff alleges that the defendant engaged in conduct intended to hide its breach of fiduciary duty, thereby preventing the plaintiff's discovery of the underlying breach. This issue was not placed before us in *Diduck I* and is, therefore, one of first impression in this Circuit.

■ In support of its argument, Pfizer cites various circuits that have held that the "fraud or concealment" provision does not automatically apply to fraud claims, but rather incorporates the federal concealment rule, also known as the "fraudulent concealment" doctrine. *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir.1996); *J. Geils Band Employee Benefit Plan v. Smith Barney*, 76 F.3d 1245, 1252 (1st Cir.1996); *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1401–02 (9th Cir.1995); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172–1173 (D.C.Cir.1994); *Radiology Ctr. v. Stifel Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir.1990); *Schaefer v.*

*Arkansas Med. Soc'y,* 853 F.2d 1487, 1491–1492 (8th Cir.1988). The concealment rule, established by the Supreme Court in *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874), grew from the soil of equitable estoppel. It provides that when a defendant's wrongdoing "has been concealed, or is of such character as to conceal itself, the statute [of limitations] does not begin to run until the [wrongdoing] is discovered" by the plaintiff. *Id.* at 349–50; *see also Black's Law Dictionary* 282 (7th ed.1999). Therefore, to be entitled to the six-year "fraud or concealment" limitations period, these courts require that, in addition to alleging a breach of fiduciary duty (be it fraud or any other act or omission), the plaintiff must also allege that the defendant committed either: (1) a "self-concealing act"—an act committed during the course of the breach that has the effect of concealing the breach from the plaintiff; or (2) "active concealment"—an act distinct from and subsequent to the breach intended to conceal it. *See, e.g., In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 242 F.3d 497, 503 (3d Cir.2001).

For a number of reasons, we decline to follow our sister circuits in fusing the phrase "fraud *or* concealment" into the single term "fraudulent concealment." First, the genesis of this uniformly adopted theory is a footnote in a district court opinion that cites no legal support for the proposition.[2] Second, the "fraud or concealment" provision does not "toll" the otherwise applicable six-or three-year statute of limitations established in § 413(1) or (2); rather, it prescribes a separate statute of limitations of six years from the date of discovery.

Third, principles of statutory interpretation counsel strongly against merging the two terms. Relying on the canon of statutory construction that "words grouped in a list should be given a related meaning," some courts have held that the term "fraud" cannot refer to the common-law cause of action because there is no such thing as a cause of action for "concealment." *Radiology Ctr.,* 919 F.2d at 1220. However, as the Supreme Court has recently held: "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

The plain language of the statute states that the six-year limitations period applies to "case[s] of ' fraud or concealment." When the statute was enacted, "fraud" was defined as "a false representation of a matter of fact, whether by words or conduct, by false or misleading allegations or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury." *Black's Law Dictionary* 788 (Rev. 4th ed.1968); *compare Black's Law Dictionary* 670 (7th ed.1999) ("[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment"). And "concealment" was defined as "[a] withholding of something which one knows and which one, in duty, is bound to reveal." *Black's Law Dictionary* 360 (Rev. 4th ed.1968); *compare Black's*

**2.** The First, Third, Seventh, Ninth, and D.C. Circuits all cite the Eighth Circuit decision in *Schaefer,* 853 F.2d at 1491–1492, which, in turn, relied on *Foltz v. U.S. News & World Report, Inc.,* 663 F.Supp. 1494, 1537 n. 66 (D.D.C.1987) (noting that "any claim under ERISA § 502(a)(3) may [ ... ] be tolled under the fraudulent concealment doctrine incorporated in section 413, 29 U.S.C. § 1113.").

*Law Dictionary* 282 (7th ed.1999) ("[t]he act of refraining from disclosure; esp[ecially] an act by which one prevents or hinders the discovery of something"). "Concealment of a cause of action" was similarly defined as follows: "To constitute it so as to prevent running of a limitations, some trick or artifice must be employed to prevent inquiry or elude investigation, or to mislead and hinder [a] party who has a cause of action from obtaining information, and acts relied on must be of an affirmative character and fraudulent." *Black's Law Dictionary* 361 (Rev. 4th ed.1968).

Giving each term independent significance (as one must when terms are used in the disjunctive unless the context dictates otherwise, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)) the six-year statute of limitations should be applied to cases in which a fiduciary: (1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; *or* (2) engaged in acts to hinder the discovery of a breach of fiduciary duty. *In re Unisys Corp.*, 242 F.3d at 513–16 (Mansmann, J., concurring in part, and concurring in the result in part). This interpretation is amply supported by the provision's legislative history.

A preliminary draft of § 413 provided:

In the case of a willfully false or fraudulent statement or representation of a material fact or the willful concealment of, or willful failure to disclose, a material fact required by this Act to be disclosed, a proceeding in court may be brought at any time within ten years after such violation occurs.

S. 4, 93rd Cong., 1st Sess. § 11 (draft, Jan. 4, 1973), *reprinted*, 1 Legislative History of the Employee Retirement and Income Security Act of 1974, at 315 (1976). Clearly, Congress intended to provide a lengthier statute of limitations where the fiduciary breached its duty by misrepresenting or failing to disclose a material fact that ERISA required the fiduciary to disclose, most likely because such violations would be difficult to discover. Although the final version of the statute adopted a six-year term and a discovery rule (i.e., the limitations period begins to run when the employee discovers or with due diligence should have discovered the breach) it retained the class of actions to which the exception applied. The pleonastic description of a cause of action for breach of fiduciary duty arising from the commission of a fraud (whether it be via affirmative misrepresentation, omission or concealment of a material fact) was replaced by the simpler term "fraud." The term "concealment" would thus be superfluous unless it be given its common, independent meaning with respect to causes of action. Therefore, in light of the adoption of the discovery rule, the term "concealment" arguably incorporates the "fraudulent concealment" doctrine.

Accordingly, our interpretation of ERISA § 413's "fraud or concealment" provision overlaps somewhat with that of our sister circuits as we construe it to apply "in cases of fraud or [fraudulent] concealment."[3]

---

3. Indeed, for purposes of this case, Pfizer's argument in favor of our sister circuits' limitation of the provision to cases of fraudulent concealment presents a distinction without a difference. The majority of circuits interpreting § 413 in this manner have concluded that affirmative misrepresentations of a material fact are self-concealing acts bringing the action within the "fraud or concealment" provision. *E.g., J. Geils Band*, 76 F.3d at 1253 n. 9; *Martin*, 966 F.2d at 1094–95; *see also State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.1988) (holding that, in cases of fraudulent concealment, "the

## B. *Leave to Amend the Complaint*

■ It is not dispositive that plaintiffs' claims fall under the "fraud or concealment" exception. To get the advantage of the six-year statute of limitations, the plaintiffs must plead fraud with the requisite particularity. Fed.R.Civ.P. 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy this requirement, a plaintiff should specify the time, place, speaker, and content of the alleged misrepresentations. *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). In addition, the complaint should explain how the misrepresentations were fraudulent and "plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987) (internal quotation marks and citation omitted).

■ Here, the complaint alleged only that Pfizer violated its fiduciary duty with respect to each plaintiff:

by making affirmative material representations that caused the plaintiff to believe that no enhancement of employee benefits would be offered to employees or was being seriously considered by the defendant; ... by giving incomplete and untruthful responses to the plaintiff's inquiries about employee options

and benefits in that, in response to the plaintiff's inquiries, the defendant failed to disclose that it had decided to offer enhanced benefits to employees or was seriously considering making such an offer....

The district court, therefore, correctly held that the plaintiffs failed to plead fraud with the requisite particularity. Plaintiffs argue, however, that the district court erred by refusing to grant them leave to replead on the ground that such amendment would be futile. We agree with plaintiffs.

■ A district court's denial of leave to file an amended complaint is reviewed for abuse of discretion. *Jones v. New York Div. of Military and Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999). Where, as here, plaintiffs specifically request leave to amend in the event that the court is inclined to dismiss on Rule 9(b) grounds, the failure to grant leave to amend is an abuse of discretion unless the plaintiff has acted in bad faith or the amendment would be futile. *Luce,* 802 F.2d at 56–57.[4] Granting leave to amend at the summary judgment stage would be futile unless the plaintiffs offered evidence in support of each element of common law fraud, including: (1) a material false representation or omission of an existing fact; (2) knowledge of falsity; (3) intent to defraud; (4) reasonable reliance; and (5) damages. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 276 (2d Cir.1992) ("*Diduck II* ").

plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing.")

4. Pfizer's assertion of bad faith and undue delay on the part of plaintiffs for failing to seek leave to amend sooner rings hollow in light of the fact that Pfizer never moved to dismiss under Fed.R.Civ.P. 12(b)(6) and

moved for summary judgment on Rule 9(b) grounds only after the close of discovery, by which time it had all of the particulars. The policies behind Rule 9(b)'s pleading requirements are not served by such behavior. *Cf. Bonilla v. Trebol Motors Corp.,* 150 F.3d 77, 81 (1st Cir.1998) (treating opposition papers themselves as amended complaint because "[a] remand at this stage to allow an amendment to the complaint to restate th[e] information would be silly").

In an ERISA action alleging misrepresentation of future pension benefits, information is "material" if there is a "substantial likelihood" that the misrepresentation "would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 123 (2d Cir.1997) (internal quotation marks and citation omitted). An ERISA fiduciary may not make "guarantees regarding future benefits that misrepresent present facts." *Id.* at 122. Regardless of whether a specific plan is under serious consideration, a fiduciary has "a duty to deal fairly and honestly with its beneficiaries." *Id.* at 124. Plaintiffs should have been granted leave to replead. Their opposition papers demonstrated that they could satisfy Rule 9(b)'s particularity requirement and could establish a *prima facie* case of common law fraud.

The district court erred in holding that plaintiffs "have not identified a misrepresentation of any material fact" because "there is no evidence that Pfizer even considered to offer the [November 1991] VSO while the plaintiffs were employed." *Caputo*, 89 F.Supp.2d at 240. The representations made to the plaintiffs were arguably "material" because no reasonable employee would have retired after more than 30 years with the company if they only had to wait a few months to receive a "golden handshake." Moreover, we have already rejected Pfizer's argument that a specific plan must have been under "serious consideration" at the time the employee made a specific inquiry. *Ballone*, 109 F.3d at 123.

There is sufficient evidence in the record to show that Schachner's statement to Pebbles that he would "never live long enough to see a golden handshake" and Hightower's and Provencher's statements to Robertson that "no other package would

be offered in the future—it was a once in a lifetime package" were known to be false at the time they were made. Pfizer's denial that these statements were made simply creates a genuine issue of material fact. With respect to the specific denials of managers and human resource personnel, plaintiffs have offered Schachner's testimony from the *Mullins* trial in which he admits that, from January 1, 1990 through the end of 1991:(1) it was "Pfizer's policy to withhold information about the consideration of benefit enhancements like the VSO until the enhancements were approved by the company's Corporate Projects Committee"; and (2) "it would have been untruthful for Pfizer managers to lead Pfizer employees to believe that there would not be separation packages offered in connection with any reductions in manpower at the Groton plant."

Finally, there is evidence that in the Spring of 1990 Pfizer knew that: (1) another VSO would be offered if the Groton Plant ceased production of penicillin and citric acid; and (2) five jobs in the Engineering division were already slotted for elimination in 1991 even absent these shutdowns. Indeed, on appeal, Pfizer switches gears and argues that no reasonable employee could have believed that no VSO would be offered in the future if circumstances so required. At a minimum, Pfizer should have informed the plaintiffs of these facts.

Accordingly, the district court erred by denying the plaintiffs' request to amend the complaint in order to earn the six-year statute of limitations and by granting summary judgment on the ground that the plaintiffs' claims are time barred. Under the "fraud or concealment" provision of § 413, plaintiffs' action is timely because it was brought within six years of when, with due diligence, they should have discovered

the fraud—i.e., within six years of the announcement of the November 1991 VSO.

### C. *The "Actual Knowledge" Requirement*

██ Even assuming *arguendo* that the six-year statute of limitations was unavailable to the plaintiffs, the district court erred in dismissing their complaint as time barred under the three-year statute of limitations on the ground that they had "actual knowledge" of the breach when they learned that the VSO was announced in November 1991.[5]

 Although this Court has not previously defined the term, we now hold that a plaintiff has "actual knowledge of the breach or violation" within the meaning of ERISA § 413(2), 29 U.S.C. § 1113(2), when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act. *Accord Maher v. Strachan Shipping Co.*, 68 F.3d 951, 954 (5th Cir.1995); *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir.1992). While a plaintiff need not have knowledge of the relevant law, *Blanton v. Anzalone*, 760 F.2d 989, 992 (9th Cir.1985), he must have knowledge of all facts necessary to constitute a claim. Such material facts "could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Gluck*, 960 F.2d at 1177. However, "[t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty . . . cannot communicate the existence of an underlying breach." *Fink v. National Sav. & Trust Co.*, 772 F.2d

951, 957 (D.C.Cir.1985); *see also Waller v. Blue Cross of California*, 32 F.3d 1337, 1341 (9th Cir.1994).

Here, Pfizer's offering of the 1991 VSO was not inherently suspect, nor did it constitute a breach of fiduciary duty or an ERISA violation. Therefore, plaintiffs' knowledge of the existence of the 1991 VSO was insufficient to trigger the three-year statute of limitations. Although the announcement should have (and did) give plaintiffs reason to *suspect* that Pfizer had lied to them, "it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had specific knowledge of the actual breach of duty upon which [they sued]." *Brock v. Nellis*, 809 F.2d 753, 755 (11th Cir.1987).

██ Plaintiffs claim that they were intentionally misled as to the possibility of another VSO being offered in the near future. We have held that a breach of fiduciary duty occurs when an employer makes "guarantees regarding future benefits that *misrepresent present facts*." *Ballone*, 109 F.3d at 122 (emphasis added). Upon receiving an inquiry from an employee, the fiduciary must "convey to a lay beneficiary . . . correct and complete material information about his status and options." *Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8 (2d Cir.1997) (citation omitted). Thus, an ERISA plaintiff cannot be said to have "actual knowledge of the breach or violation" until he has actual knowledge that his employer misrepresented a present fact or failed to disclose all material information known at the time of inquiry.

5. We address this issue for two reasons. First, to correct a mistake of law upon which the district court based its decision below. And second, because this holding will apply directly to any plaintiffs whose amended complaint, filed upon remand, fails to plead fraud with the requisite particularity. As the New

York Court of Appeals recently noted, "[w]e arguably need not reach [this] issue. However, because of its particularly significant role in this case, it seems prudent [to address this issue]." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 240, 727 N.Y.S.2d 7, 18, 750 N.E.2d 1055 (2001).

If Pfizer's prior representations to the plaintiffs were true and complete at the time they were made, the announcement of the 1991 VSO certainly would not have given the plaintiffs "actual knowledge" of a breach or violation. Rather, Pfizer breached its fiduciary duty only if the responses to the plaintiffs' questions were *untruthful at the time they were made*, or if material information *known to Pfizer* was withheld when the plaintiffs inquired about their pension benefits.

By holding that plaintiffs were barred from bringing their action three years after learning of the 1991 VSO—the date on which plaintiffs *should have known* that Pfizer *may have* breached its fiduciary duty—the district court erroneously construed § 413(2) as being triggered upon plaintiffs' "constructive knowledge" of a breach. *Radiology Ctr.*, 919 F.2d at 1222; *Brock*, 809 F.2d at 754–755. This interpretation is repugnant to the plain language of the statute as well as its legislative history. A constructive knowledge provision was expressly removed from § 413(2) in 1987. H.R. 391, 100th Cong., 1st Sess. 1987, *reprinted in,* 1987 U.S.C.C.A.N. 2313–1 (deleting the following italicized language: "(2) three years after the earliest date *(A)* on which the plaintiff had actual knowledge of the breach or violation, *or (B) on which a report from which he could reasonably be expected to have obtained knowledge of*

*such breach or violation was filed with the Secretary [of Labor] under this title.*").

 Moreover, when the Legislature intends to incorporate a constructive knowledge requirement into an ERISA statute of limitations, it ordinarily does so explicitly, e.g., giving a plaintiff three years to bring suit after the earliest date on which he "acquired *or should have acquired* actual knowledge of the existence of such cause of action." 29 U.S.C. § 1370(f)(2)(A) (statute of limitations for suits alleging improper terminations of single-employer plans) (emphasis added); *see also* 29 U.S.C. § 1451(f)(2) (statute of limitations for claim to compel employer to make withdrawal liability payment); 29 U.S.C. § 1303(e)(6)(B) (statute of limitations in provision allowing Pension Benefit Guaranty Corporation to sue to enforce its investigative powers).

Accordingly, the district court erred in holding that plaintiffs' claims were time barred under the three-year statute of limitations because they did not have "actual knowledge" of Pfizer's breach until they learned during the *Mullins* trial in 1995 that Pfizer anticipated the offering of the 1991 VSO as early as the Spring of 1990; and, therefore, it arguably misrepresented present facts when responding to plaintiffs' inquiries.[6]

We do not hold today that ERISA plaintiffs cannot bring an action until they re-

6. Pfizer contends that we should disregard the plaintiffs' affidavits to this effect on the grounds that: (1) they were drafted by an attorney; and (2) the plaintiffs made no mention of the *Mullins* trial during their depositions. We are loath to even address such an argument and thus relegate our response to this footnote. First, during their depositions, the plaintiffs were never asked when they had "actual knowledge" of the breach within the meaning of the ERISA statute. They were asked, in layman's terms, if they thought that Pfizer had lied to them and, if so, why or

what evidence did they have. They responded as any layman would, by saying that they *thought* (not knew) that Pfizer lied when they announced the 1991 VSO because they believed that it would have taken a long time to formulate the plan. Second, havoc would be wreaked if we elected to disregard the positions taken by parties in their affidavits simply because they were drafted by their lawyers, and rely instead on the alleged "legal" positions taken by parties in response to poorly phrased questions during depositions.

ceive information that would normally be obtained only after conducting discovery. Nor are we saying that the plaintiffs in this case could not in good faith have commenced an action upon learning of the 1991 VSO, as the elements of Pfizer's breach of fiduciary duty were in place at that time. *See* Fed.R.Civ.P. 11(b)(3) (the presentment of a pleading to the court certifies only that the allegations "have evidentiary support or . . . are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery"). Rather, we conclude only that the district court erred in holding that, as a matter of law, plaintiffs are barred from filing their action under ERISA's three-year "actual knowledge" statute of limitations.

## CONCLUSION

We have considered the parties' remaining contentions and find them to be without merit. We therefore VACATE the judgment dismissing the action, and REMAND for further proceedings consistent with this opinion.

POOLER, J., concurring in part and dissenting in part:

Because I agree with the majority regarding its interpretation of the fraud or concealment provision of 29 U.S.C. § 1113 and with its directive to the district court to allow plaintiffs the opportunity to amend their complaint in order to plead fraud with the requisite particularity, I join in Parts A and B of the opinion. I of course express no view as to whether plaintiffs will be successful in their attempts to bring an amended complaint within Section 1113's six-year statute of limitations.

However, I respectfully dissent from Part C of the majority opinion for two reasons. First, I believe that Part C is dicta and that its holding is not necessary to disposition of this appeal. Although the majority states that its holding in Part C would apply to any plaintiff whose amended complaint fails to fall within the six-year statute of limitations, that future dispute, if indeed it ever occurs, is not before us.

Second, I do not agree with the majority's position that the district court made an error of law in its application of Section 1113's actual knowledge requirement. Even if I apply the definition of actual knowledge that the majority proposes, I see no issue of material fact tending to support plaintiffs' argument that they lacked actual knowledge of defendant's breach of fiduciary duty until litigation of a completely separate claim by a completely unrelated plaintiff took place. It is undisputed that in November 1991 plaintiffs knew that (1) defendant offered a voluntary separation package for which they would have been eligible if they had not recently retired; (2) defendant had told them in response to direct inquiries prior to retirement that no package·was forthcoming; and (3) the timing of these events was sufficiently suspect to give them reason to believe that defendant had lied to them.

Thus, in November 1991, plaintiffs had knowledge of all the facts necessary to constitute a claim, but they waited nearly five years before filing a complaint. I believe that the majority goes awry when it holds that plaintiffs lacked actual knowledge of defendant's breach until they learned of facts disclosed *in a completely separate trial.* The majority creates a major loophole for dilatory plaintiffs by allowing them to delay the start of the statute of limitations period until they know not only that they have a cause of action but also until they have details of

the case that normally surface during discovery. I therefore dissent from Part C.